# Mullen and Wife versus Wilson & Kelly.

*Conveyance by Husband to Wife on commencement of new and hazardous Business, void.— Object of Conveyance a Question for the Jury.— Omission to answer Points, when not error.*

1. A conveyance of real estate to a wife by a husband, to secure it to her free from debts which he might contract in a new business into which he was about to enter as a partner, is of no effect against creditors who became such in the business of the partnership.

2. The object of the conveyance is a question of fact for the jury to decide.

3. It cannot be assigned for error, that the court did not qualify the principle laid down as governing the case where a conveyance was made with a view to entering into a new business, by charging that it must be hazardous; where the judge was not asked so to instruct the jury, and the hazardous nature of the business was plainly an element of the case.

4. Where the defendants presented points on the trial, to the effect that creditors could not avoid the conveyance, if they knew of it before and at the time the indebtedness was contracted; or if the husband was out of debt when the conveyance was made, the first firm into which he entered having been dissolved before the debt originated the same business being continued in the same place, which points were not answered in the charge; the neglect so to instruct the jury is not error, where the judge was not asked specifically so to charge, and his silence did not mislead the jury in investigating the main question in the case.

ERROR to the Common Pleas of *Berks county*.

This was an action of ejectment, by Gile J. Wilson and John

H. Kelly against James Mullen and Hester Mullen, for a house and lot in the city of Reading. The plaintiffs claimed as sheriff's vendees of the property at a sale held under their execution against Jacob Snell, James Mullen, Robert Banford, and Henry McCarty.

The title of the defendant was this :—

James Mullen purchased the property in 1850 from Isaac Ledom and wife. On the 12th of July 1856, he conveyed the property to S. E. Ancona, with a parol trust, that he should hold the same for Mrs. Mullen, which deed was recorded on the 14th of July 1856. Ancona conveyed to Mrs. Mullen September 13th 1856, which deed was recorded July 11th 1857. No money was paid upon either of these two deeds.

On the 14th day of July 1856, James Mullen entered into articles of copartnership with Jacob Snell and Robert Banford, to carry on a forge in the city of Reading. The firm bought out an old firm, the members of which were Jacob Snell and one Snyder ; taking the partnership assets, and agreeing to pay the partnership liabilities. Mullen, Snell and Banford were forge-men by trade. It was agreed that each of the partners should put $1000 cash into the concern (which was done), and also give their personal labour in the forge. Snell's capital was in the assets of the old firm, and it was agreed that he should keep the books and assist at the works. In March 1857, a new partnership was formed by the addition of Henry McCarty to the former firm, and a rolling-mill was added to the forge. Up to this time business had been prosperous.

The plaintiffs had discounted the business paper received by the firm from time to time to a large amount, and in October 1857 held business paper received by the firm, and endorsed by them to the amount of $4000. The business of the country being deranged, and a great many failures occurring, they became apprehensive that these notes would not be met at maturity. Under these circumstances they applied to the firm, and procured a judgment-bond dated October 22d 1857, conditioned for the payment of $4092.60, being the amount of the notes held by them, which notes they returned to the firm. Judgment was entered October 23d 1857. On this a *fieri facias* was issued to August Term 1858, No. 150, and personal property of the firm sold to the amount of $876.90, which amount was applied to the claim of the plaintiffs. The real estate of the firm was afterwards sold for $10,950, a small amount of which was realized by the plaintiffs.

December 9th 1859, a *pluries fieri facias* was issued by the plaintiffs, and levied upon the house and lot in controversy. A *vend. exponas* was sued out February 19th 1860, and the property sold March 24th 1860, to plaintiffs for $120, and deed acknowledged

[Mullen v. Wilson.]

April 16th 1860. At the sheriff's sale Mrs. Mullen gave notice that the property sold did not belong to James Mullen, but to her, and that the purchaser at the sale would obtain no title. The plaintiffs, after obtaining the sheriff's deed, brought this ejectment, as above stated.

It was contended by the plaintiffs, on the trial below, that the deed of July 12th 1856, from James Mullen to S. E. Ancona, was void as to subsequent creditors, for the reason that Mullen was about to enter into partnership. The defendants insisted that as Mullen was not only entirely out of debt at the time, but actually put $1000 in cash into the firm, and as the debt to Wilson and Kelly was incurred long after the deed to Ancona was placed on record, was the debt of a new firm, and they trusted the firm exclusively, and had knowledge that the several partners had no other property than that in the firm business, the deed was not void.

The court (JONES, P. J.) charged the jury as follows :—

" This is an action of ejectment by Wilson against Mullen and wife, to recover the possession of a certain messuage bought by the plaintiff at sheriff's sale, at which sale was sold whatever right, title, and interest in the same Mullen had. The defence here is, that Mullen had no right, title, and interest in the said messuage, bound by the judgment under which that sale was had, but that the property thereof was duly and exclusively vested 'n his wife. [The plaintiff seeks to impeach the conveyances by which it is alleged the wife acquired title, mainly on the ground that those conveyances were made for the purpose of securing the premises to the wife free from any debts that her husband might create or contract in a business into which he was about to enter as a partner with others. If it be true that those conveyances were made under such circumstances, and with such a purpose, they will be of no effect against creditors of the husband, who became such in their dealings with him in the course of business of that partnership. Was the deed of Mullen and wife to Ancona of the 12th of July 1856, and that from Ancona to her of the 13th of September 1856, made for the purpose and under the circumstances mentioned? If ay, there stands nothing in the way of the plaintiff's recovering ; if nay, there stands nothing in the way of the defendant. The matter of fact is narrowed down to that, and as you find it, from the evidence in the case, your verdict will be one way or the other.]

[" The law does not prohibit a man from providing for those who are near and dear to him. But he may not do it in such a way as to withdraw his means from existing creditors, nor from such as may become creditors, by putting his property away upon the eve of going into a new business with a purpose of making provision against its risks.] That purpose, however, is the very

essence of the thing.    The jury must be satisfied that it existed, that it was the motive that lead to those conveyances, before they can find for the plaintiff."

The whole evidence in the case was then read to the jury, and presented to them in the order of time.

Under these instructions there was a verdict and judgment in favour of plaintiffs.    Whereupon the defendant sued out this writ, and assigned for error that part of the charge of the court which is printed above in brackets, and that the court below erred in not instructing the jury, 3. That if the plaintiffs, before and at the time Mullen became indebted to them, knew that he no longer owned the property in question, they cannot now invalidate the conveyance; and, 4. That as the debt to the plaintiff originated long after the firm into which Mullen first entered (and which left no, debts) had been dissolved, if he was out of debt when the conveyance was made, creditors of the new firm could not invalidate that conveyance.

*John S. Richards* and *J. Hagenman*, for plaintiff in error.

*John Banks* and *Henry W. Smith*, for defendant.

The opinion of the court was delivered, March 16th 1863, by
THOMPSON, J.—The law of a case like this is explicitly stated by my brother Woodward in Black *v.* Nease, 1 Wright 433, where he says: "It is unquestionable law, that a husband may settle property on his wife, even without the intervention of a trustee, provided he be free from debt, and is not about to embark in business, where his credit will be pledged for new indebtedness. * * *    But if such settlement be made in fraud of creditors, on the eve of a new business, and with a view of providing against its contingencies, it is as unavailing against the new creditors as old ones; and moneys so disposed of will be treated as his property and not the wife's."    To the same point is Thompson *v.* Dougherty, 12 S. & R. 456; Mateer *v.* Hissim, 3 Penna. Rep. 160; Sanders *v.* Wagonseller, 7 Harris 248; Snyder *v.* Christ, 3 Wright 499.

The conveyance of the property in question, in trust for Mrs. Mullen, as the testimony shows, was a day or two after the agreement of her husband to enter into the iron business in partnership with Snell & Banford, and after he had received a conveyance of the one-third interest in the forge and machinery valued at $8436.20, subject to about $7000 debt.    The one-third of this, together with $1000, which Mullen agreed to put in as capital, really constituted his indebtedness on the 12th of July 1856, when he conveyed the property in trust for his wife; and it does not appear that he had any other estate or property what-

[Mullen v. Wilson.]

ever. It is true, the articles of partnership were not entered into until two days after the conveyance. The trustee, Ancona, testifies that Mullen spoke to him a week or two before the execution of the deed about taking it. The witness was certain that he spoke to him at or about the time he was going into the Keystone Forge, with Snell & Banford. "He said he was acting under advice in the matter; that he was to make the deed before entering into articles of agreement." The witness further stated without objection, "I cannot say that he did say that he did that to secure his family, in case he should be unfortunate, but this seemed to be evidently his object." If the facts stated by this witness, in connection with the date of the conveyance to Mullen of a third interest in the forge, and the date of the deed in trust for his wife, there could scarcely be doubt but this was his object. The court submitted it as question of fact to the jury, to say what was the object of the conveyance; that if it was to secure the premises to the wife, free from any debts that he might create or contract, in a business into which he was about to enter as a partner with others, it would be of no effect against creditors, who became such in their dealings with him in the course of the partnership. This was undoubtedly correct. Indeed I am inclined to think that the transfer might have been held to be fraudulent as to creditors, on the ground of actual indebtedness, equal to the whole value of the property at the moment of conveyance; for, if I understand the. testimony, he had actually contracted for an interest in the firm, and agreed to be jointly bound for the debts of the old firm, two days before the conveyance in trust for his wife. But this position was not taken and need not be vindicated. On the facts submitted and properly in evidence, the jury found the object of the conveyance to have been to withdraw the property from the reach of future creditors. This necessarily carried the case against the plaintiffs in error, and there is no principle now which can relieve them from the consequences of such a finding.

We think there was no room for the complaint that the judge did not qualify the principle of law which he laid down as governing, where a conveyance is made with a view to entering into new business, by charging that it must be hazardous, to render it fraudulent as to creditors. It might be enough to say, in answer to this, that he was not asked to give any special instructions on this point; and that those who desired them should have asked the attention of the court to the matter by a prayer for instructions. But no one can doubt but this was an element in the case, for it was in proof that the business was hazardous. There was no evidence that it was *not* so, by the party now claiming that the non-hazardous character of the business should have been left to the jury. Everybody knows that a business requiring

8 WR.—27

[Mullen *v.* Wilson.]

large outlays, and dependent on the character of the times for active returns, as the iron business does, must be and is hazardous. If it was not hazardous, and yet profitable, many more would engage in it, and the fact that so few do so engage, is some evidence that it is hazardous, if proof were wanting, beyond the knowledge of all who live where it is carried on. There is nothing in this. These views sufficiently disclose our opinion of the first and second assignments of error.

The third and fourth errors need but little notice. The complaint is that the learned judge should have charged as therein stated, although there was no request to do so. His silence in the particular alleged, did not mislead the jury in investigating the main question. It was not in the character of a negative pregnant, so as to be the subject of error. We think the charge was sufficient for the case, and adequate to its circumstances. These errors must therefore be overruled.

We cannot fail to see that the case is a hard one on the plaintiff in error, if possibly he had no fraudulent intent; but the policy of the law on the facts found, places the transaction in a category not to be helped by courts of justice, without doing injustice. Mullen was either badly advised or recklessly acted without advice, or did so fraudulently in making the conveyance under the circumstances disclosed. The hardship is, not that the property was taken for a debt for which he was liable, but that owing to its complications it brought almost nothing, and the debt principally remains. That is not the fault of. the law, but results from an effort to avoid it, and must be borne by those who made the effort.

Judgment affirmed.