# SCHREYER *v.* SCOTT.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 197. Argued January 31, 1890. — Decided March 24, 1890.

In determining the rules applicable to conveyances of real estate from a husband to his wife, reference should be had not only to the decisions of this court, but also to those of the state where the parties lived, and where the transactions took place.

The rule obtains in New York, and is recognized by this court, that even a

voluntary conveyance from husband to wife is good as against subsequent creditors, unless it was made with the intent to defraud such subsequent creditors,; or, unless there was secrecy in the transaction, by which knowledge of it was withheld from such creditors who dealt with the grantor, upon the faith of his owning the property transferred; or, unless the transfer was made with a view of entering into some new and hazardous business, the risk of which the grantor intended should be cast upon the parties having dealings with him in the new business.

When real estate is acquired by a husband in his own name by the use of the separate property of his wife, a subsequent conveyance of it by him to her is not a voluntary conveyance, but the transfer of the legal title to the equitable owner.

IN EQUITY. The case is stated in the opinion.

*Mr. Frederic R. Coudert* for appellant. *Mr. A. O. Salter* filed a brief for same, citing: *Allen* v. *Massey,* 17 Wall. 351; *Carr* v. *Breese,* 81 N. Y. 584; *Phœnix Bank* v. *Stafford,* 89 N. Y. 405; *Cole* v. *Tyler,* 65 N. Y. 73; *Dunlap* v. *Hawkins,* 59 N. Y. 342; *Wickes* v. *Clarke,* 8 Paige, 161; *Van Wyck* v. *Seward,* 1 Edw. Ch. 327; *Wallace* v. *Penfield,* 106 U. S. 260; *Hinde* v. *Longworth,* 11 Wheat. 199; *Clark* v. *Killian,* 103 U. S. 766; *Smith* v. *Vodges,* 92 U. S. 183; *Graham* v. *Railroad Co.,* 102 U. S. 148; *Horback* v. *Hill,* 112 U. S. 144; *Pepper* v. *Carter,* 11 Missouri, 540; *Payne* v. *Stanton,* 59 Missouri, 158; *Lerow* v. *Witmarth,* 9 Allen, 382; *S. C.* 83 Am. Dec. 701; *Pratt* v. *Curtis,* 2 Lowell, 87; *Herring* v. *Richards,* 1 McCrary, 570; *Dygert* v. *Remerschnider,* 32 N. Y. 629; *Todd* v. *Nelson,* 109 N Y. 316; *Matthai* v. *Heather,* 57 Maryland, 483; *Kimble* v. *Smith,* 95 Penn. St. 69; *Harlan* v. *Maglaughlin,* 90 Penn. St. 293; *Curtis* v. *Fox,* 47 N. Y. 301; *Phillips* v. *Wooster,* 36 N. Y. 412; *Walter* v. *Lane,* 1 MacArthur, 275; *Claflin* v. *Mess,* 30 N. J. Eq. (3 Stewart) 11; *Babcock* v. *Eckler,* 24 N. Y. 623; *Medsker* v. *Bonebrake,* 108 U. S. 66; *Baker* v. *Gilman,* 52 Barb. 26; *Reed* v. *Woodman,* 4 Maine, 400; *Lehmberg* v. *Biberstein,* 51 Texas, 457; *Monroe* v. *Smith,* 79 Penn. St. 459; *Herring* v. *Richards,* 3 Fed. Rep. 439; *Pell* v. *Tredwell,* 5 Wend. 661; *Nippe's Appeal,* 75 Penn. St. 472; *Kempner* v. *Churchill,* 8 Wall. 362; *Fuller* v. *Brewster,* 53 Maryland, 361; *Washband* v. *Washband,* 27 Connecticut, 431; *Seward* v. *Jackson,* 8 Cowen, 430.

*Mr. T. M. Tyng,* for appellee, cited: *Dudley* v. *Easton,* 104
U. S. 99; *Warren* v. *Moody,* 122 U. S. 132; *Adams* v. *Collier,*
122 U. S. 382; *Young* v. *Hermans,* 66 N. Y. 374; *Carpenter*
v. *Roe,* 10 N. Y. 227; *King* v. *Wilcox,* 11 Paige, 589; *Savage*
v. *Murphy,* 34 N. Y. 508; *S. C.* 90 Am. Dec. 733; *Smith* v.
*Vodges,* 92 U. S. 183; *Case* v. *Phelps,* 39 N. Y. 164; *Dunn* v.
*Hornbeck,* 72 N. Y. 80; *Wallace* v. *Penfield,* 106 U. S. 260;
*Horback* v. *Hill,* 112 U. S. 144; *Blennerhasset* v. *Sherman,*
105 U. S. 100; *Schmidt* v. *Schmidt,* 48 N. Y. Superior Ct.
520; *Lent* v. *Howard,* 89 N. Y. 169; *Adair* v. *Lott,* 3 Hill,
182; *Coleman* v. *Burr,* 93 N. Y. 17; *Reynolds* v. *Robinson,*
64 N. Y. 589; *Chew* v. *Hyman,* 10 Bissell, 240; *Kerrison* v.
*Stewart,* 93 U. S. 155; *Whelan* v. *Whelan,* 3 Cowen, 537;
*Western Railroad* v. *Nolan,* 48 N. Y. 513; *Vetterlein* v.
*Barnes,* 124 U. S. 169.

Mr. Justice Brewer delivered the opinion of the court.

The question in this case is whether certain transfers of
property made by John Schreyer to his wife, Anna Maria
Schreyer, were fraudulent and void as against Peter J. Van-
derbilt, a creditor of John Schreyer. The case is here on ap-
peal from a decree of the Circuit Court for the Southern Dis-
trict of New York, brought by the assignee in bankruptcy of
Schreyer against Schreyer individually, and as executor, etc.,
of his wife, now deceased. The Circuit Court, 25 Fed. Rep.
83, found that the transfers were fraudulent, and decreed that
the bankrupt, as executor and trustee, convey the real estate
and bonds and mortgages hereafter described to the assignee
in bankruptcy. From such decree this appeal has been taken.
The facts are these: On January 21, 1871, Schreyer conveyed
to his wife the following real estate situated in the city of New
York: Nos. 348 and 350 West 39th Street and Nos. 351, 353
and 355 West 42d Street. The title was passed from Schreyer
to his wife, by conveyance to Edward Sharkey, and from him
to Mrs. Schreyer. On October 15, 1870, Schreyer and his
wife conveyed No. 420 West 40th Street to George Gebhart
and No. 422 West 40th Street to Matthew L. Ritchie, who
each thereupon executed mortgages for $5000 to Mrs. Schreyer.

These conveyances and mortgages were all recorded in 1871. Notice was thus given, by public record, of title in Mrs. Schreyer to both the real estate and the mortgages. Thereafter, and in 1874, buildings were erected on the two lots last mentioned, the mortgages for $5000 surrendered and two new mortgages taken — one from Gebhart to Mrs. Schreyer for $7750 on premises No. 420 West 40th Street, and one from Ritchie to Mrs. Schreyer for $8850 on premises No. 422 West 40th Street. The claim of Vanderbilt arose in this way: On February 2, 1874, a building contract was entered into between George Gebhart and Matthew L. Ritchie, as owners of premises Nos. 420 and 422 West 40th Street, with Vanderbilt, whereby he covenanted to erect two buildings on said premises for the sum of $8175, to be paid in the following manner: "When the said houses are topped out the payment of five thousand ($5000) dollars, by assignment of mortgage held by John Schreyer on the property of Anna Maria Schreyer, No. 350 West 42d Street, in the city of New York; three thousand one hundred and seventy-five ($3175) dollars when the houses are fully completed as above." On May 5, 1874, Vanderbilt had so far completed his contract that he was entitled to an assignment of the bond and mortgage. He then demanded and received from Schreyer not only an assignment, but a guaranty of the bond and mortgage. There was no new consideration for this guaranty. In 1876 a prior mortgage on the premises covered by the bond and mortgage assigned as above set forth was foreclosed, and swept away the entire property, so that this bond and mortgage became worthless; whereupon Schreyer was sued on his guaranty, and judgment recovered thereon. On September 17, 1878, John Schreyer was adjudged a bankrupt upon a creditor's petition, filed August 23, 1878. Several claims were proved against his estate in bankruptcy, but all have been satisfied except that of Vanderbilt; so that, while this action was brought by an assignee in bankruptcy, it was really for the sole benefit of Vanderbilt. On September 6, 1876, Mrs. Schreyer died, leaving a will by which her property was devised and bequeathed to her children; her husband was named as executor; and he, individually and as executor,

was the defendant in this suit. And now the contention of the plaintiff below is, that the conveyances of January 21, 1871, and the two mortgages from Gebhart and Ritchie to Mrs. Schreyer in 1874 were fraudulent and void as against the claim of Vanderbilt. The conveyances were made and recorded more than three years prior to the building contract, out of which Vanderbilt's claim arose; and, while the mortgages to Mrs. Schreyer were executed and recorded during the same year with the building contract, yet the obligation assumed by Schreyer was a voluntary one, without consideration, and after a contract expressly providing for payment in another way, was conditional, and only became a fixed indebtedness two years thereafter, when by the foreclosure proceedings the worthlessness of the guaranteed bond and mortgage was developed. Obviously, very clear and direct testimony is essential to support an adjudication that these various transfers were fraudulent and void as against this subsequent creditor. In determining the rules applicable to such transactions reference should be had not only to the decisions of this court, but also to those of the courts of New York, where the parties lived and the transactions took place. *Allen* v. *Massey*, 17 Wall. 351; *Graham* v. *Railroad Company*, 102 U. S. 148; *Wallace* v. *Penfield*, 106 U. S. 260, 263, 264.

In a recent case in the Court of Appeals of New York, *Todd* v. *Nelson*, 109 N. Y. 316, 327, that court thus stated the law: "The theory upon which deeds conveying the property of an individual to some third party have been set aside as fraudulent in regard to subsequent creditors of the grantor has been that he has made a secret conveyance of his property while remaining in the possession and seeming ownership thereof, and has obtained credit thereby, while embarking in some hazardous business requiring such credit, or the debts which he has incurred were incurred soon after the conveyance, thus making the fraudulent intent a natural and almost a necessary inference, and in this way he has been enabled to obtain the property of others who were relying upon an appearance which was wholly delusive. Such are the cases cited by the learned counsel for the appellants." See also *Phillips*

v. *Wooster*, 36 N. Y. 412; *Curtis* v. *Fox*, 47 N. Y. 299; *Dunlap* v. *Hawkins*, 59 N. Y. 342; *Carr* v. *Breese*, 81 N. Y. 584; and *Phœnix Bank* v. *Stafford*, 89 N. Y. 405.

Turning now to the cases in this court: It was said in *Smith* v. *Vodges*, 92 U. S. 183: "The law of this case is too well settled to admit of doubt. In order to defeat a settlement made by a husband upon his wife, it must be intended to defraud existing creditors, or creditors whose rights are expected shortly to supervene, or creditors whose rights may and do so supervene; the settler purposing to throw the hazards of business in which he is about to engage upon others, instead of honestly holding his means subject to the chance of those adverse results to which all business enterprises are liable. *Sexton* v. *Wheaton*, 8 Wheat. 229; *Mullen* v. *Wilson*, 44 Penn. St. 413; *Stileman* v. *Ashdown*, 2 Atk. 478, 481." In *Graham* v. *Railroad Company*, 102 U. S. 148, 154, it was said: "It seems clear that subsequent creditors have no better right than subsequent purchasers, to question a previous transaction in which the debtor's property was obtained from him by fraud, which he has acquiesced in, and which he has manifested no desire to disturb. Yet, in such a case, subsequent purchasers have no such right." In *Wallace* v. *Penfield*, 106 U. S. 260, 262, in which it appeared that the husband transferring property to his wife was indebted at the time of the transfer, though not to the party complaining of the transaction, the court observed: "His indebtedness existing at the time of the settlement upon the wife, as well as that which arose during the period of the improvements, was subsequently, and without unreasonable delay, fully discharged by him. Commenced in 1868, they were all, with trifling exceptions, completed and paid for before the close of the summer of 1869. So far as the record discloses, no creditor, who was such when the settlement was made or the improvements were going on, was materially hindered by the withdrawal by Williams, from his means or business, of the sums necessary to pay for the land and improvements. Those who seek, in this suit, to impeach the original settlement, or to reach the means he invested in improving his wife's land, became his creditors some

time after the improvements (with slight exceptions not worth mentioning) had been made and paid for. If they trusted him in the belief that he owned the land, it was negligent in them so to do, for the conveyance of February 11, 1868, duly acknowledged, was filed for record within a few days after its execution." And in *Horbach* v. *Hill*, 112 U. S. 144, 149, this language was used : " The complainant, not showing that he was at the time a creditor, cannot complain. Even a voluntary conveyance is good as against subsequent creditors, unless executed as a cover for future schemes of fraud." From these authorities, it is evident that the rule obtaining in New York, as well as recognized by this court, is, that even a voluntary conveyance from husband to wife is good as against subsequent creditors; unless it was made with the intent to defraud such subsequent creditors ; or there was secrecy in the transaction by which knowledge of it was withheld from such creditors, who dealt with the grantor upon the faith of his owning the property transferred ; or the transfer was made with a view of entering into some new and hazardous business, the risk of which the grantor intended should be cast upon the parties having dealings with him in the new business. Tested by these rules, it is impossible to sustain an adjudication, upon the testimony in this case, that the transfer of either the real estate or the bonds and mortgages was fraudulent as against the creditor Vanderbilt.

Assuming, in the first instance, that both transfers were purely voluntary, the deeds to Mrs. Schreyer were made and recorded three years before the building contract was signed, or the work done, out of which Vanderbilt's claim arose. There was thus that constructive notice referred to in *Wallace* v. *Penfield, supra,* as sufficient. Further, on May 21st, 1872, Vanderbilt entered into a written contract with Mrs. Schreyer to do the mason work in the construction of a building on the lots conveyed, the contract price being $10,500. He thus had actual as well as constructive notice, more than two years before he entered into this last contract, that Mrs. Schreyer was the owner of these lots. With such knowledge he entered into the last contract, and thereafter accepted Schreyer's

guaranty. How can he then say, with such knowledge, that he was defrauded by those conveyances? Is it possible to suppose that the Schreyers, when they made those conveyances, looked forward three years, and anticipated that Gebhart and Ritchie would seek to improve their real estate, and obtain pecuniary assistance from them, and, with that prevision, planned to defraud any one who might rely upon Mr. Schreyer's guaranty? Further than that, Schreyer did not at the time purpose to, and did not in fact, change his regular business, or enter upon any new business. From 1854 his business was that of a stair-builder, which business he prosecuted steadily until he sold out, in 1876, six years after the conveyances. Notwithstanding these conveyances, he retained all the property used in his stair-building business, was in debt only from five hundred to one thousand dollars, and had money in bank, accounts due him, and personal property used in his business, aggregating from ten to twenty thousand dollars. It is true that some $12,000 of mechanic's liens had been filed against buildings which he owned, and which had been recently constructed; but these liens were by sub-contractors, with possibly one or two minor exceptions. Money for their payment was deposited with certain trust companies; and, as the amounts due were adjudicated, they were paid out of moneys thus deposited. Could anything be clearer than that these conveyances were free from all imputation of fraud, as against anybody, and especially as against such a remotely subsequent creditor?

While the transaction as to the bonds and mortgages is nearer in point of time to the creation of the indebtedness to Vanderbilt, it is so remote in fact as also to be free from imputation of fraud. The circumstances surrounding the creation of this debt must be stated a little more in detail: Gebhart and Ritchie owned the lots; they were each subject to two mortgages; one was a mortgage of $3750, given to Ellen E. Ward, from whom the Schreyers had originally purchased the lots; and one to Mrs. Schreyer, originally $5000, but reduced by payments to about $2200. Desiring to build, in the belief that the rents from new buildings on the front of

the lots could be used to pay off their indebtedness, they arranged with the Schreyers for an advance of the amount that should be needed in addition to the sums they could borrow on mortgages from the Ward estate. The Ward estate agreed to loan $10,000 on each lot and contemplated building. In pursuance of this arrangement, Mrs. Schreyer released her mortgages, new ones were executed to the Ward estate for $10,000 on each lot, and the difference in money, $6000 and over, was paid to Gebhart and Ritchie, respectively, and by them handed to the Schreyers; and, when the buildings were completed, new mortgages were executed to Mrs. Schreyer for the $2200 of her original mortgage, and the excess of the cost above the amount furnished by the Ward estate. Schreyer, who was a practical builder, superintended the construction of the buildings. Vanderbilt made a contract with Gebhart and Ritchie for the mason work, as heretofore stated. He entered into this contract with knowledge that the $5000 bond and mortgage which Schreyer proposed to transfer in part payment was second and subordinate to a prior mortgage of $16,000. He must have assumed, when he made the contract, that the property mortgaged was good for both mortgages; and, according to the testimony, it was then considered worth from thirty to thirty-five thousand dollars. When he had so far completed his contract as to be entitled to the assignment of his bond and mortgage, he demanded its guaranty from Schreyer; and he, in order that there might be no delay in the work, gave the required guaranty. Two years thereafter, owing to depreciation in value of real estate, the property covered by this $5000 bond and mortgage was sold under foreclosure of the $16,000 mortgage, and realized only enough to pay that. Hence, Schreyer became liable on his guaranty. Is there anything in these facts to show fraud in intent or fraud in result? Obviously not. Vanderbilt entered into his contract with full knowledge of all the circumstances, unquestionably considering the $5000 bond and mortgage well secured, and willing to take his chances of its payment on foreclosure, if not otherwise. Schreyer, making no representations or concealments, doubtless acted in the same belief;

and when, after partial completion of the contract, he, to prevent delay in the future work, guaranteed payment of the bond and mortgage, he did so in the belief that it was amply secured, and that he was assuming little or no risk in his guaranty. If fraud or wrong was intended on his part, obviously he would have refused to guarantee, and left Vanderbilt to take that which his contract entitled him to. The very fact of his voluntarily assuming a risk which he was under no obligations to assume, and which in no manner inured to his benefit, is satisfactory evidence that he had no thought of fraud. The subsequent depreciation of the value of real estate, and the failure to realize on the sale thereafter more than the first $16,000 mortgage, was something anticipated by neither party. It was one of those vicissitudes unexpected and unlooked for — not planned for — and doubtless an astonishment to all the parties. All the arrangements for the execution of these second mortgages to Mrs. Schreyer were made before any guaranty or personal liability on the part of Schreyer was demanded or thought of, and it does not appear that he was in debt to any one at the time the arrangements were so made. Surely this unnecessary and voluntary assumption on his part in no manner indicates fraud in the arrangements already entered into and subsequently carried out, for the execution of these bonds and mortgages to Mrs. Schreyer. In the case of *Carr* v. *Breese*, 81 N. Y. 584, which was like this in presenting an unexpected depreciation in the value of property, the court justly observed: "Reverses came unexpectedly, while in the pursuit of his ordinary business, without any intention on his part to defraud his creditors, and it may be said that, without any fault on his part, except a want of human foresight, he became embarrassed and insolvent. It is not apparent that Breese had in view, at the time of the execution of the deed to his wife, any such result, or that he in any way contributed to produce the result which followed, for the purpose of defrauding his creditors and enjoying the advantages to be derived from the provisions made for his wife. Under such circumstances, the presumption of any fraudulent intent is rebutted, and it is manifest that he had done no more

than any business man has a right to do, to provide against future misfortune when he is abundantly able to do so." Further, as negativing any fraud in intent, a year after this guaranty, and when undoubtedly there must have been developing some probability of liability therefrom, Schreyer purchased other real estate and took the title in his own name. Still, again, not only did he continue in his regular business of stair-building after these transactions, but it is evident from his bank-books, produced in evidence, that his business was of considerable magnitude, for between August 26, 1869, and September 6, 1876, a period of about seven years, and including the time of these transactions, his deposits amounted to $391,296.44.

We have thus far considered the case as to these transfers from Schreyer to his wife, as if they were purely voluntary; but according to his testimony, and there is none contradicting it, they were far from voluntary, but rather the passing of the legal title to his wife, of property of which she was, prior thereto, the equitable owner, or in which she had at least a large equitable interest. She had between twenty-five hundred and three thousand dollars in money when they were married, in April, 1854. She purchased the leasehold interest in the lots on 39th Street, paying therefor out of her own moneys, $500 each. They lived on one of the lots, and the building on the other was rented. Unquestionably, therefore, the rents belonged to her. She also kept boarders for a number of years, two of them living with her for at least ten years, paying $5.00 per week each. The balance of the money she had when married she passed over to him from time to time for improvements on the property, or use in his business. It is true that afterwards buildings of considerable value were put upon these lots; and we do not wish to be understood as affirming that the entire cost of the property was the proceeds of her investment, or her earnings. All that the testimony fairly discloses is, that at the time of her marriage she was possessed of separate property, which was the foundation and largely the source of these subsequent accumulations. So that the conveyances in 1871 were not purely vol-

antary, but meritorious and upon good consideration. The same may be said as to the bonds and mortgages placed in her name in 1874.

It is objected by the appellees that Schreyer's testimony is not to be depended upon, because contradictory, confused and uncertain; that there is no definiteness in it as to amounts and dates ; and that wrong in the transactions is evident, because the moneys received for rent after the conveyances, were deposited by Schreyer in his own name in bank, and were obviously managed and handled by him as his own, as no accounts were kept between husband and wife of their separate moneys, but all were mingled in one fund, in his hands. But does all this indicate fraud? If his testimony is worthless and to be rejected, then there is practically no testimony interpreting those transactions, and the court never presumes fraud. The very confusion and carelessness in the dealings between husband and wife make against rather than in favor of the claim of fraud. There is no evidence that he was in debt at the time of these conveyances, at least beyond a trifling amount, which was subsequently paid ; and if the parties had intended fraud and wrong, unquestionably their accounts would have been kept carefully and accurately, and books would now be presented showing such accounts. Husband and wife evidently saw no necessity of dealing with each other at arm's length; the title to the property was placed in her name when there was no legal or equitable reason why it should not be done; and the rents and other cash receipts were not unnaturally kept in one account and handled as one fund. The lack of substantial indebtedness and the record of the transfer being established, the carelessness of their dealings tends to prove honesty rather than to establish fraud.

Again, it is objected that the conduct of Schreyer, in respect to the bankrupt proceedings, is suspicious ; that the bankrupt proceedings, though nominally at the instance of a creditor, were really at his instance ; that the bankrupt and the creditor found their counsel in the same office; and that the other claims proved against him were in some suspicious way fixed up and adjusted, leaving only Vanderbilt's claim unpaid.

Conceding all that is claimed by counsel in reference to these bankrupt proceedings in 1878, it is difficult to deduce therefrom any evidence of wrong in the transactions in 1871 and 1874. It may be that Schreyer did not want to pay Vanderbilt's claim; and it may be, as claimed by counsel, that he improperly sought the assistance of the bankrupt court to be relieved from liability therefrom; but it would be a very unjust conclusion from such facts, that in 1871, when he made the conveyances to his wife, and in 1874, when he made the arrangement for the execution of the bonds and mortgages to his wife, anterior to any known or expected liability to Vanderbilt, he was acting with a view of subsequently going through bankruptcy, or defrauding Vanderbilt or any other creditor.

Recapitulating, the conveyances in 1871 were meritorious, upon good consideration, made by one in debt in only a trifling sum, and retaining an abundance of property for the discharge of those debts, and who in fact subsequently, and as they became due, paid them — made by one continuing and expecting to continue in the same profitable and not hazardous business in which he had been engaged for nearly a score of years, with no thought of entering upon any new or hazardous business, and more than three years before any liability to Vanderbilt was incurred or even thought of. And the placing of the notes, bonds and mortgages in 1874 in Mrs. Schreyer's name was in pursuance of an arrangement entered into when the husband was not in debt, and when no obligation, fixed or contingent, to Vanderbilt had been entered into or thought of.

Under these circumstances it is error to hold that the transactions were fraudulent and void as against Vanderbilt.

*The decree of the Circuit Court must be reversed, and the case remanded, with instructions for further proceedings in accordance with the views herein expressed.*