KLINGER v. HYMAN et al.

(Circuit Court of Appeals, Second Circuit. February 19, 1915.)

No. 204.

1. FRAUDULENT CONVEYANCES ⬦⇒74—INTENT—CONSIDERATION.

Under the statutes prohibiting fraudulent conveyances, it is the fraudulent intent that invalidates the conveyance, and a conveyance made for full value may be invalidated, if made with actual fraudulent intent, though absence of consideration is the most usual evidence of fraudulent intent, and as a rule is sufficient to render the conveyance void against existing creditors.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 186–190; Dec. Dig. ⬦⇒74.]

2. FRAUDULENT CONVEYANCES ⬦⇒1—LAW GOVERNING—REAL PROPERTY.

The law of the state where real property is situated governs in determining whether a conveyance of such property is fraudulent.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 1; Dec. Dig. ⬦⇒1.]

---

⬦⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. FRAUDULENT CONVEYANCES ☜⟳1—LAW GOVERNING—PERSONAL PROPERTY.
  A transfer of personal property by a debtor, valid under the law of the
  debtor's domicile or where the transfer was made, is valid wherever the
  property is, unless contrary to the policy of the law of that place.
    [Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §
  1; Dec. Dig. ☜⟳1.]

4. FRAUDULENT CONVEYANCES ☜⟳95—VOLUNTARY CONVEYANCE—CONVEYANCE
  TO WIFE.
  Under 2 Birdseye's Rev. St. N. Y. (8th Ed.) p. 3058, prohibiting fraudu-
  lent conveyances of real property, and providing that the question of
  fraudulent intent is one of fact and not of law, and that a conveyance is
  not invalid solely because not founded on the valuable consideration, and
  3 Birdseye's Rev. St. N. Y. (8th Ed.) pp. 2635, 2636, prohibiting fraudulent
  transfers of personal property, and providing that the existence of fraud-
  ulent intent is a question of fact and not of law, the mere fact that a
  voluntary conveyance was made by a husband to his wife does not in-
  validate it, and it will be sustained if, after close scrutiny, it is shown
  to be fair and honest, and not a contrivance to place the property beyond
  the reach of creditors, and is a settlement by the husband on the wife not
  disproportionate to his means, and which still leaves ample property with
  which to meet his debts.
    [Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§
  243–288; Dec. Dig. ☜⟳95.]

5. FRAUDULENT CONVEYANCES ☜⟳277—PRESUMPTIONS—VOLUNTARY CONVEY-
  ANCE.
  Under the law of New York, a voluntary conveyance by one indebted at
  the time is presumptively fraudulent.
    [Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§
  799, 809–814; Dec. Dig. ☜⟳277.]

6. BANKRUPTCY ☜⟳303 — FRAUDULENT CONVEYANCE — SUFFICIENCY OF EVI-
  DENCE—INTENT—VOLUNTARY CONVEYANCE.
  In a suit by a trustee in bankruptcy to set aside voluntary convey-
  ances made by the bankrupts to their wives nearly a year before the ad-
  judication, evidence held not to rebut the presumption of fraudulent in-
  tent arising from such conveyances.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462;
  Dec. Dig. ☜⟳303.]

Appeal from the District Court of the United States for the South-
ern District of New York.

This cause comes here on an appeal from a decree of the United
States District Court for the Southern District of New York. The
facts are stated in the opinion.

Prince & Nathan, of New York City (Alfred B. Nathan, of New
York City, of counsel), for appellants.

Feiner & Maass, of New York City (Herbert H. Maass and Ira
Skutch, both of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. The question in the case is whether cer-
tain voluntary transfers of property made by Isaac B. Hyman and Mon-
tague E. Hyman to their respective wives, Florence H. Hyman and
Florence S. Hyman, are fraudulent and void as against Benjamin
Klinger, the trustee in bankruptcy of Isaac B. and Montague E. Hy-

☜⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

man. The court below found the transfers fraudulent, and ordered them canceled, annulled, and set aside. The claim of the trustee is that the transfers of the property were made at a time when the husbands were either insolvent or so involved that insolvency followed in the natural sequence of events and that the transfers were made with the intent to hinder, delay, and defraud their creditors. The facts are these:

The firm of I. B. Hyman & Co. started in business in the city of New York in 1901 and was engaged in the manufacture of waists and dresses. It began business on borrowed money and in a small way. But the business prospered, and in June, 1911, the assets amounted to about $142,000. In addition to the assets which the copartners owned as usual assets of business, they were the owners of an apartment house in West Eighty-First street, in the borough of Manhattan, in the city of New York, also of 15 lots at Long Beach, Long Island, and of 50 shares of the capital stock of the corporation of Bonwit, Teller & Co., of the par value of $5,000. The value of the apartment house, the Long Beach lots, and the Bonwit-Teller stock was estimated to be over $40,000.

The copartners in October, 1912, incorporated their business under the name of I. B. Hyman & Co., Incorporated, and transferred to the newly organized corporation all the assets of the partnership, except the specific properties above referred to, in exchange for the capital stock of the corporation, of the par value of $100,000. The corporation assumed payment of the partnership debts. After the business of I. B. Hyman & Co. was incorporated, there was no change in the management or in the business. Isaac Hyman, as formerly, had charge of the manufacturing of dresses and waists, and his brother Montague had charge of the selling. No new interests were taken into the corporation. Of the 1,000 shares of the capital stock, Isaac held 600 shares, and Montague held the remainder.

Two months later, on December 20, 1912, the two Hymans transferred to their wives the Long Beach lots, and on December 24, 1912, the apartment house in Eighty-First street, Manhattan, New York. And about the same time they also transferred to them the Bonwit, Teller & Co. stock. The deed dated December 20, 1912, was recorded January 2, 1913, and the deed dated December 24, 1912, was recorded on January 7, 1913. Two days thereafter, on December 26, 1912, Florence H. Hyman and Florence S. Hyman transferred the properties they had received from their husbands to the San Diego Realty Company, Incorporated, receiving in exchange therefor the entire capital stock of the corporation, of the par value of $10,000. The deeds, dated December 26, 1912, were recorded on January 8, 1913.

The affairs of the San Diego Realty Company were managed by the two Hymans and by Ellis Hyman, their father; the three constituting the board of directors and officers of the company. The wives were the sole stockholders, but they attended no meetings, knew nothing about the management of the property, and took no part in the conduct of its affairs. They never received the rents from the properties. The rents from the apartment house, it was stated by Ellis Hyman, who

was the agent for the property and collected the rents, were expended in repairs and payment of the taxes and the interest on the mortgages on the property. At no time were the wives consulted with reference to the steps to be taken in connection with the property of the corporation. Almost a year after the transfer of the property to the wives, and on November 11, 1913, Isaac B. and Montague E. Hyman were adjudicated bankrupts, individually and as members of the firm of I. B. Hyman & Co.

The reason given by Isaac B. Hyman for the incorporation of the business of the partnership, the transfer to the wives, and the transfer by the wives to a separate corporation, was that his health had been seriously impaired by an automobile accident. He testified that for a time he was unable to go to business at all for three months and that he could not walk. After a time he was able to be about, first on crutches and then with a cane. He had water on the knee. Both legs and his jaw had been injured. The ligaments of both sides of his right knee had been torn. Then, he testified, he got a swelling or enlargement of the spleen, and the consequence of that was that he could not lie down; therefore he could not sleep; it pressed upon his stomach, and he could not eat, and naturally he became very weak and very much out of condition, and he practically got nervous prostration from it, and lost weight and became "like a shadow," and could not attend to any business. Tuberculosis had developed before the accident occurred, and when that happened he testified that he felt as though his end might come at any time. That being the condition he found himself in, he went over the subject with his brother, and it was decided that in view of the precarious state of his health it was best to incorporate the business and that they should turn over certain properties to their wives. It was also thought wise to form the San Diego Realty Company, and to that company the wives transferred all the properties they received from their husbands. The reason assigned by the brothers for the creation of the San Diego Realty Company was that the wives were not business women and knew nothing about business, and it was thought advisable, therefore, to create a corporation to manage the properties for the women.

The corporation began to lose money in February, 1913, and the explanation given of the failure by Isaac Hyman is interesting. The main part of the business from 1905 to 1913, consisted in the manufacture of lingerie and cotton dresses, lace trimmed, although waists were also manufactured. The lingerie dress business was at its height in 1911 and 1912, but in 1913 lingerie dresses ceased to be longer in style. "In other words," he testified, "overnight, women did not want any more lingerie dresses. The character of the business changed. Whereas our big months were from February and until July 1st, instead of doing a big business, our business fell off 50 per cent. for the whole year. In other words, our business for the spring season fell off about 75 per cent. So that was absolutely the reason I. B. Hyman & Co., Incorporated, started to lose money in February, 1913. And that eventually led up to the financial troubles and difficulties it had. There was no more lingerie dresses."

It is admitted that the transfers to the wives were voluntary, and that the grantors were indebted at the time the transfers were made. At the trial below it was impossible to ascertain the exact amount of the indebtedness, the partnership books of account having disappeared. Isaac Hyman testified that on July 1, 1912, several months prior to the incorporation of the business and the transfer to the wives, the assets of the firm amounted to $100,000 above the liabilities, and on July 1, 1913—which was several months after the incorporation and the transfer to the wives—the assets above the liabilities were somewhere between $16,000 and $20,000. Asked how much commercial paper he and his brother were personally and individually liable for at the time they transferred the property to their wives, he answered that he did not know exactly.

Isaac Hyman testified that at the time the properties were transferred no action had been brought by any creditor and that no suits were threatened by any creditor; as bills matured they were paid; debts owing by the partnership or the corporation at the time of the transfer of the property by him and his brother to the wives were paid. But the evidence leads rather to the conclusion that the "payments" to which he refers were not payments in fact, but were rather renewals and extensions of the prior existing indebtedness.

The Hymans place stress upon the fact that a month prior to the transfers of the property their financial statement showed that, exclusive of the property transferred their assets amounted to $136,000, or excluding the good will of the business to about $97,000, and their liabilities amounted to about $36,000, leaving a surplus of not less than $50,000, and that six months after the transfers the statement showed assets, exclusive of good will, of $63,000, and liabilities of $46,000, leaving a surplus of $17,000. But the worth of these financial statements, both those made before the transfers and those made after the transfers and prior to the bankruptcy, depends upon the value placed by the Hymans themselves on the merchandise they allege they possessed at the time the financial statements were made.

It ought to be added that the testimony discloses the fact that within seven months of the time the transfers were made a business which is alleged to have been prosperous and successful, with a solvency of over $60,000, was reduced to bankruptcy, with liabilities in excess of $40,-000, and the assets turned over to the trustee and subsequently sold realized a sum not in excess of $6,000; the creditors receiving only a 5 per cent. dividend.

Montague E. Hyman was in court ready to testify, and was not put on the stand in order to save time. That fact appears in the record, and the further fact that it was agreed by counsel on both sides that he would corroborate his brother's testimony.

Too much reliance cannot be placed on the testimony of Isaac Hyman. He testified that at the time the properties were transferred to the wives, or about that time, he notified the assistant cashier of the Second National Bank, who was its credit man, of the transfers of the property to the San Diego Realty Company, and that all the real property and stocks, except the stock of I. B. Hyman & Co., Incorporated,

had been so transferred. This bank was the largest individual creditor of the Hymans with a claim of $17,000. But this conversation never took place at the time Isaac said it did, if the testimony of the assistant cashier of the bank is believed. He testified that after the transfers had been made Isaac represented that among the assets he and his brother possessed was the real estate in question, and that the bank had no knowledge to the contrary until August, 1913, when Isaac stated that he could not meet his obligations.

There was a mortgage on the Eighty-First street apartment house in favor of Ellis Hyman, who is alleged to have bought the mortgage from one Jennie Hawkins, probably in 1911. Ellis foreclosed the mortgages, and the property was sold at public sale, and there were no bidders, so that he bought it in to protect himself, and the title is now vested in him. The Long Beach lots were also bought in by Ellis, having been sold by the sheriff on judgments obtained by him for moneys he claimed to have advanced to the San Diego Realty Company to take care of its properties. It was a little over a year from the time that the San Diego Realty Company was organized and took over the properties before these judgments were entered. And the Bonwit, Teller & Co. stock was sold by the San Diego Realty Company, and the entire proceeds of $2,500 were transferred also to Ellis Hyman in part payment of an alleged indebtedness to him. The result is that the title to all the properties which the husbands transferred to the wives, and which this proceeding was instituted to set aside and avoid, is now of record in Ellis Hyman, the father of Isaac and Montague; and the defendants Florence H. and Florence S. and the San Diego Realty Company have appeared and disclosed hands empty of any proceeds of the conveyances which the trustee is seeking to annul. And Ellis is the one member of the Hyman family who was not joined in the present suit. If the action of the court below is affirmed, and the transfers are annulled, another action will be necessary to reach the assets in the hands of Ellis Hyman, if the trustee should be advised by his counsel that in his opinion Ellis Hyman is not a bona fide purchaser for value and without notice and is not entitled to retain in his possession the assets which reached his hands.

Creditors have always constituted a favored class. The preservation of their rights has been a fundamental policy of all enlightened nations. Under Roman law a debtor who failed to pay his debts was liable to be put to death, or to be sold into foreign slavery beyond the Tiber. Under the law of England imprisonment for debt was the fate of those who incurred debts and failed to discharge them. No step was taken in England to relieve persons from liability to imprisonment for debt until the act of 1808 was passed exempting judgment debtors from imprisonment for debts not exceeding £20. Other statutes followed in 1844, 1845, and 1846. And it was not until 1869 that imprisonment for debt was abolished altogether in that country, except in the case of dishonest debtors. In this country, also, it was usual under the early laws to imprison debtors. The early laws of New York, those of England, and those of other states in this country, permitted their imprisonment. But the act of February 13,

1789 (Laws 1789, c. 24), amended March 10, 1791 (Laws 1791, c. 29), provided for the discharge of debtors imprisoned on execution for an amount not exceeding £1,000 upon their executing an assignment of their property for the benefit of the creditors who charged them in execution. In 1819 (Laws 1819, c. 101) an act was passed which provided for the exoneration of insolvent debtors arising ex contractu, upon a surrender of all their property for the benefit of their creditors. But the noted Stilwell Act of 1831 (Laws 1831, c. 300) seems to be regarded as the act which finally abolished in that state imprisonment for debt based on contract when the defendant was innocent of fraud. See People ex rel. Levine v. Shea, 201 N. Y. 474, 94 N. E. 1060 (1911). However, even now debtors may still be imprisoned for debt in New York in a variety of circumstances. See sections 549 and 550 of the Code.

In 1839 (5 Stat. 321, c. 35) Congress enacted that no person should be imprisoned for debt in any state on process issuing out of a federal court, where by the laws of the state imprisonment for debt had been abolished; and where imprisonment for debt was allowed under conditions and restrictions, then it should be allowed upon federal process only under the same conditions and restrictions.

The policy of the law of England on the subject is disclosed in the language of Justice Hyde, in Manby v. Scott, 1 Mod. 132 (1659), in which he said:

"If a man be taken in execution and lie in prison for debt, neither the plaintiff at whose suit he is arrested, nor the sheriff who took him, is bound to find him meat, drink or clothes, but he must live on his own, or on charity of others; and if no man will relieve him, let him die in the name of God, says the law, and so say I."

And so it was under the law of New York, which provided that he was to be—

"safely kept in secure custody in the manner prescribed by law, at his own expense, until he should satisfy the execution or be discharged according to law."

The abolition of imprisonment for debt was accomplished with difficulty, encountering the opposition of many eminent and influential persons, who believed the change threatened the commercial prosperity of the country.

The Great Charter of King John provided that no freeman should give or sell away his lands, so that no residue would remain to the lord of the fee out of which the service pertaining to the fee might be enforced. And in 1376 the Parliament of England began to legislate on the subject of fraudulent conveyances, enacting St. 50 Edw. III, c. 6, which was followed three years later by St. 2 Rich. II, c. 3. In 1487 St. 3 Henry VIII, c. 4, was passed. Then in 1570 there was enacted the most celebrated and important of the statutes against fraudulent conveyances, St. 13 Eliz. c. 5, perpetuated in 1587 by St. 29 Eliz. c. 5. In the United States the statute of 13 Eliz. has in practically all the states been adopted or re-enacted in more or less similar terms. Mr. Justice Story says "that it has been universally adopted in America as the basis of our jurisprudence upon the sub-

ject." Story's Eq. Jur. § 353. And Chancellor Kent, in Sands v. Codwise (1808) 4 Johns. (N. Y.) 536, 596, 4 Am. Dec. 305, writing of the statute, says that it is "only in affirmance of the principles of the common law." As the Supreme Court of Alabama expressed it in an early case, the common law enjoins integrity as a virtue paramount to generosity. Planters', etc., Bank v. Walker, 7 Ala. 926, 946 (1845).

[1] Under the statutes it is the fraudulent intent which invalidates the conveyance. A transfer of property, even though there had been a full, adequate, and valuable consideration, may be void under the statutes, if it is effected with fraudulent intent. Twyne's Case, 3 Coke, 212. But the most usual evidence of a fraudulent intent is found in the absence of consideration. And it has been laid down as a rule that a voluntary alienation of property is, in general, void as against creditors. There are two requisites to the validity of the transfer: (1) It must be made in good faith. (2) It must be for a good consideration, which the courts have construed to mean a valuable consideration. Hence a transfer to a wife or child, however meritorious it may be, is not valid as against creditors, if it is made under circumstances that would invalidate it if it had been made to a stranger. For a voluntary transfer to a stranger, and to a wife as well, may under some circumstances be sustained. Any one may make a gift, if the value of that which is given bears such an insignificant proportion to his estate that his remaining property is ample to discharge his debts. The gift is valid—

"if the donor has, at the time, the pecuniary ability to withdraw the amount of the donation from his estate without the least hazard to his creditors, or in any material degree lessening their prospects for payment." Jenkyn v. Vaughan, 3 Drew, 425; Kent v. Riley, L. R. 14 Eq. 190.

The law recognizes legal obligations to creditors as superior to the moral obligations one is under to a wife or children. That one engaged in hazardous pursuits owes a sacred duty to his wife and children to set apart a reasonable portion of his estate to secure them against the ills of poverty is not denied. But in the discharge of the moral obligation to wife and children one is not at liberty to forget that he is under legal as well as moral obligations to his creditors. The law will not allow him to hinder, delay or defraud the latter. It is not that the law is oblivious of the moral obligations due from a husband to his wife. It is only that in discharging them he must not be dishonest. In Bispham's Equity, § 247, the law is stated as follows:

"The extent to which a man has the power to make a voluntary disposition of his property is frequently called into question in the cases of settlements made by a husband upon his wife. There are many decisions to the effect that a gift from a husband to a wife, to be sustained even as against subsequent creditors, must be reasonable—that is, it must bear a just and fair proportion to the actual amount of his property and to his condition and prospects in life. A man cannot denude himself of all or a greater part of his means for the purpose of making a gift to his wife. To allow him to do so would be to open a wide door to fraud, for by putting his property in his wife's name he might practically secure the means of support for himself, and at the same time obtain for his property a complete immunity from his liabilities. What the amount of this reasonable provision should be seems to be a matter of some little doubt."

In Seitz v. Mitchell, 94 U. S. 580, 24 L. Ed. 179 (1876), the Supreme Court of the United States said of a conveyance by a husband to his wife, where the wife claimed to have purchased the property from her husband, and the creditors of the husband sought to reach it for payment of his debts:

"There is nothing to show that the wife had any opportunity for obtaining money except from her husband. Purchases of either real or personal property made by the wife of an insolvent debtor during coverture are justly regarded with suspicion, unless it clearly appears that the consideration was paid out of her separate estate. Such is the community of interest between husband and wife; such purchases are so often made a cover for a debtor's property, are so frequently resorted to for the purpose of withdrawing his property from the reach of his creditors and preserving it for his own use, and they hold forth such temptations for fraud, that they require close scrutiny. In a contest between the creditors of the husband and the wife, there is, and there should be, a presumption against her, which she must overcome by affirmative proof. Such has always been the rule of the common law; and the rule continues, though statutes have modified the doctrine that gave to the husband absolutely the personal property of the wife in possession, and the right to reduce into his possession and ownership all her choses in action. Authorities to this effect are very numerous."

In Schreyer v. Scott, 134 U. S. 405, 409, 10 Sup. Ct. 579, 33 L. Ed. 955 (1890), the court had occasion to pass upon the validity of a conveyance made by a husband to his wife, and it said:

"In determining the rules applicable to such transactions, reference should be had, not only to the decisions of this court, but also to those of the courts of New York, where the parties lived and the transactions took place."

The question involved in that case related to the right of a subsequent creditor to attack the validity of a voluntary conveyance made by a husband to his wife. In its opinion the court considered the case of Todd v. Nelson, 109 N. Y. 316, 16 N. E. 360, and cited several other of the New York cases to which we find it unnecessary to refer. The same court, in Smith v. Vodges, 92 U. S. 183, 23 L. Ed. 481 (1875), said:

"In order to defeat a settlement made by a husband upon his wife, it must be intended to defraud existing creditors, or creditors whose rights are expected shortly to supervene, or creditors whose rights may and do so supervene; the settler purposing to throw the hazards of business in which he is about to engage upon others, instead of honestly holding his means subject to the chance of those adverse results to which all business enterprises are liable."

[2, 3] In McGoon v. Scales, 9 Wall. 23, 27, 19 L. Ed. 545 (1889), the Supreme Court declared that:

"It is a principle too firmly established to admit of dispute at this day that to the law of the state in which land is situated must we look for the rules which govern its descent, alienation, and transfer, and for the effect and construction of conveyance."

If there is a legal proposition which is supported by a long and unbroken line of authorities, which no one assumes to question anywhere, it is that the lex loci rei sitæ must determine the effect to be given to a conveyance of lands. And a transfer of personal property valid by the law of the domicile of the debtor, or of the place where it is made, is a valid transfer of the property wherever it is situated, unless it is made in conflict with the settled policy of the law of the place where

the property is situated. Green v. Van Buskirk, 5 Wall. 307, 18 L. Ed. 599 (1866); Frank v. Bobbitt, 155 Mass. 112, 29 N. E. 209 (1891); Ward v. Connecticut Pipe Mfg. Co., 71 Conn. 345, 41 Atl. 1057, 42 L. R. A. 706, 71 Am. St. Rep. 207 (1899); Keller v. Paine, 107 N. Y. 83, 13 N. E. 635 (1887).

In the case at bar, both the real and personal property transferred were situated in the state of New York, and the domicile of the debtors was likewise in that state, and there it was that the transfers were executed. The validity of the transfers must be determined, therefore, by the law of New York.

[4] The Revised Statutes of the state of New York provide as follows, concerning transfers of real property:

"A conveyance or assignment in writing or otherwise, of an estate, interest or existing trust in real property or the rents or profits issuing therefrom, or a charge on real property, or on the rents or profits thereof, made with the intent to hinder, delay or defraud creditors, or other persons, of their lawful suits, damages, forfeitures, debts or demands, or a bond or other evidence of debt given, suit commenced or decree or judgment suffered, with the like intent, is void as against every person so hindered, delayed or defrauded." Birdseye's Revised Statutes, vol. 3 (8th Ed.) p. 3058.

And:

"The question of fraudulent intent in a case arising under this article, shall be deemed a question of fact and not of law; and a conveyance or charge shall not be adjudicated fraudulent as against creditors, purchasers or encumbrances, solely on the ground that it was not founded on a valuable consideration." Id. vol. 3, p. 3058.

The provision concerning transfers of personal property is as follows:

"Every transfer of any interest in personal property or the income thereof, made with the intent to hinder, delay or defraud creditors or other persons, of their lawful suits, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, suit commenced, or decree or judgment suffered with such intent, is void as against every person so hindered, delayed or defrauded." Id. vol. 2, p. 2635.

And:

"The question of the existence of fraudulent intent in cases arising under this article, is a question of fact and not of law." Id. vol. 2, p. 2636.

The mere relationship of husband and wife between the parties to a transfer is not sufficient ground for setting aside a conveyance. Childs v. Connor, 48 How. Pr. (N. Y.) 513 (1875). But transactions between husband and wife to the prejudice of the husband's creditors will be closely scrutinized by the courts in New York, as elsewhere, to see that they are fair and honest and not mere contrivances resorted to for the purpose of placing the husband's property beyond the reach of creditors. White v. Benjamin, 150 N. Y. 258, 44 N. E. 956.

In Carr v. Breese, 81 N. Y. 584 (1880), the Court of Appeals declares that a husband is authorized to make a settlement of a suitable amount of his property upon his wife if he has no dishonest purpose in view. In that case a husband, having property worth from $21,000 to $22,000 and doing a prosperous business, purchased and caused to be conveyed to his wife premises costing $16,300, of which sum

$10,600 was paid by him by mortgage on his real estate and the balance secured by a mortgage on the premises. The settlement was upheld by the court as one not unsuitable or disproportionate to his means. He continued prosperous for three years after this settlement upon the wife, was in good credit and standing financially, continued in the same business in which he had previously been engaged, and incurred no extraordinary or unusual risks. Reverses came unexpectedly, and he had paid every debt in full which he had contracted before the title to the property was vested in his wife. The deed to his wife had been placed at once upon the public records. "Under such circumstances," said the court, "the presumption of any fraudulent intent is rebutted, and it is manifest that he had done no more than any business man has a right to do, to provide against future misfortune when he is abundantly able to do so."

[5] In 1892 the Court of Appeals in Kain v. Larkin, 131 N. Y. 300, 307, 30 N. E. 105, in an opinion written by Chief Judge Earl, held that under the express terms of the New York statute it was not sufficient to condemn a conveyance of land as a fraud upon creditors that it was not founded upon a valuable consideration. A person assailing such a conveyance, the court declared, must go further and show by other evidence that it was made with the fraudulent intent, condemned in the statute.

"An owner of real estate can make a voluntary settlement thereof upon his wife and children without any consideration," said the court, "provided he has ample property left to satisfy all the just claims of his creditors. If the grantor remains solvent after the conveyance and has sufficient property left to satisfy all his just debts, then the conveyance, whatever his intention was, cannot be a fraud upon his existing creditors; and when a judgment creditor assails a conveyance made by the judgment debtor, he cannot cast upon the grantee the onus of showing good faith and of establishing that the grantor was solvent after the conveyance by simply showing that the deed was not founded upon a valuable consideration. But the person assailing the deed assumes the burden of showing that it was executed in bad faith, and that it left the grantor insolvent and without ample property to pay his existing debts and liabilities; and so it has been repeatedly held."

The above case was decided in March, and in June of the same year the question was before the court again in Smith v. Reid, 134 N. Y. 568, 31 N. E. 1082, and no decision was rendered until October of that year. The subject presumably received, along with the other questions involved, careful consideration. The court in its opinion does not refer to the case of Kain v. Larkin, but announces a conclusion which is flatly contrary to that which it declared in the former case.

"But the rule is well settled," it declares, "that a voluntary conveyance by one indebted at the time is presumptively fraudulent. Seward v. Jackson, 8 Cow. [N. Y.] 406; Erickson v. Quinn, 47 N. Y. 410; Dunlap v. Hawkins, 59 N. Y. 346; Cole v. Tyler, 65 N. Y. 78."

In 1912 the question came again before the Court of Appeals in Kerker v. Levy, 206 N. Y. 109, 99 N. E. 181, and in a brief per curiam opinion the court declared that it held that:

"The rule stated in Smith v. Reid, 134 N. Y. 568 [31 N. E. 1082], that a voluntary conveyance by one indebted at the time is presumptively fraudulent as against existing creditors is the law of this state, rather than the rule laid down in Kain v. Larkin, 131 N. Y. 300 [30 N. E. 105]."

[6] As a voluntary conveyance by one indebted at the time is, under the law of New York, prima facie fraudulent, the burden was on the defendants to rebut the presumption of fraud. The court below had the benefit of seeing and hearing the witnesses and could judge of their credibility. It came to the conclusion that the transfers were designed to put the property of the Hymans beyond the reach of their creditors. It stated it as "an irresistible conviction" that the incorporation of the different companies was a scheme on the part of the Hymans to render more plausible their individual transactions with their respective wives. It declared that it—

"was a palpable attempt on the part of the Hymans to use their wives as an anchor to protect their families in case of probable insolvency and to throw the hazards and risks of their business upon those who might and did credit them."

We see no reason for believing that the court misjudged the witnesses and came to a wrong conclusion concerning their intent. In our opinion the defendants have not sustained the burden of proof imposed upon them by the law.

The testimony in the case, instead of rebutting the presumption of fraud arising from its voluntary character, has produced a contrary impression. It is true Isaac B. Hyman has testified to the absence of fraudulent intent, and the deeds were at once recorded, and it is represented that sufficient property was retained to pay all creditors and leave a surplus. But the circumstances are so very suspicious, the failure followed so suddenly upon the transfers, the assets realized so little, and the fact that the testimony of Isaac is flatly contradicted in a material and very important matter impairs confidence in his testimony as a whole, including the financial statements upon which defendants so much rely, and lead to the conviction that the conclusion reached in the court below should not be disturbed.

The conveyances assailed by the trustee were properly set aside, as having been made with intent to hinder, delay, and defraud the creditors.

Decree affirmed.