### ENGSTROM v. LOWELL et al.

### In re PONZI.

(Circuit Court of Appeals, First Circuit. June 27, 1922.)

No. 1535.

I. **Bankruptcy** ⬤⟹175—State law determines whether transfer is fraudulent.

The question whether a particular transfer of property by a bankrupt is fraudulent, under Bankruptcy Act, § 70e (Comp. St. § 9654), must be determined by the laws of the state which govern the transaction in question.

2. **Fraudulent conveyances** ⬤⟹155—Purchaser must have had actual knowledge of fraudulent purpose.

Under the law of Massachusetts, as settled by decision, to set aside a transfer because in fraud of creditors, it must be shown that the purchaser, if paying a valuable consideration, had actual knowledge of, or participated in, the fraudulent purpose of the seller.

Appeal from the District Court of the United States for the District of Massachusetts; George W. Anderson, Judge.

Suit in equity by James A. Lowell and others, trustees in bankruptcy of Charles Ponzi, against Richard Engstrom. Decree for complainants, and defendant appeals. Reversed.

See, also, 268 Fed. 997, and 280 Fed. 193.

Edward C. Stone, of Boston, Mass. (Sawyer, Hardy, Stone & Morrison, of Boston, Mass., on the brief), for appellant.

James A. Lowell, of Boston, Mass. (William R. Sears and William C. Rogers, both of Boston, Mass., on the brief), for appellees.

Before BINGHAM and JOHNSON, Circuit Judges, and MORRIS, District Judge.

JOHNSON, Circuit Judge. This is an appeal from a final decree upon a bill in equity, in which the appellees, as trustees in bankruptcy of Charles Ponzi, are plaintiffs, and the appellant defendant, and they will be so designated herein.

By virtue of the provisions of section 70e of the Bankruptcy Act (Comp. St. § 9654), the plaintiffs ask that a conveyance of certain real estate of the defendant to the bankrupt be rescinded, and that the defendant be ordered to pay to them the consideration which he received. This section is as follows:

"The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a bona fide holder for value prior to the date of the adjudication. Such property may be recovered or its value collected from whoever may have received it, except a bona fide holder for value."

<hr>

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The bill alleged that Ponzi was engaged in a scheme to defraud the public; that under the name of the Securities Exchange Company he was selling written obligations by the terms of which the buyer was promised in 90 days 50 per cent. in addition to the amount he invested, and that, to entice the public to invest, the time for redeeming this promise was shortened to 45 days; that he represented that he was dealing in international exchange, from which he was deriving enormous profits that enabled him to do this, but that, in fact, he transacted no substantial business in international exchange of any kind, and made no profits from that or any other source; that during the time of the negotiations with the defendant, and at all times after May 1, 1920, he was insolvent, and became more so with each obligation that he issued; that the only means he had of continuing his business was the issue of new obligations; that the defendant knew, or had reasonable cause to believe, that Ponzi was engaged in a fraudulent scheme and was insolvent, and, further, that there was a material misunderstanding in regard to the contract under which the defendant was to convey certain real estate to Ponzi.

The defendant was the owner of an estate at No. 19 Slocum road in ·Lexington, Mass., and placed it for sale in the hands of one J. Clinton Thompson, an attorney. Through a real estate broker, tc: whom he had written that the property could be purchased for $35,-000, Thompson got in touch with Ponzi, and received from him an offer of $9,000 cash and a note of the Securities Exchange Company, under which name Ponzi was doing business, for $20,000, but payable in 45 days in the sum of $30,000, to be secured by a mortgage upon the property. When this offer was reported to the defendant, he testified that he stated to his attorney that he would not accept a note, but that he would sell for $9,000 cash and $30,000 additional, secured by a mortgage upon the property. He further testified that, upon the evening of the same day that this offer was reported to him, Ponzi called him up over the telephone and told him that he liked the house and would take it for $39,000, and said nothing about a note. Later Thompson reported to the defendant that Ponzi did not want to give a mortgage upon the property, but would give a certificate of deposit of the Hanover Trust Company in place of the mortgage.

The defendant declined to accept a certificate of deposit of the Hanover Trust Company, but agreed to accept a certificate of deposit of the Tremont Trust Company. Ponzi afterwards paid Thompson $5,000 and delivered to him a certificate of deposit of the Tremont Trust Company for $30,000, dated May 28, 1920, and payable to the defendant 45 days after date, with interest at 4 per cent.

Thompson delivered the certificate of deposit to the defendant and told him that he had deposited the $5,000 to his credit and that $4,000 more would be paid to him when the deed was delivered, and that it would be necessary to pay $39 for Internal Revenue stamps to be placed upon the deed.

Mrs. Engstrom and the defendant met Ponzi and his attorney at the office of Thompson in Boston, where a deed of the property was signed and delivered to Ponzi, and the defendant received from him

$4,000 in cash. After Mr. and Mrs. Engstrom had left Thompson's office, Ponzi gave Thompson this note:

"No. 4122. Boston, Mass., 5/28/20.

"The Securities Exchange Company, for and in consideration of the sum of exactly $20,000, receipt of which is hereby acknowledged, agrees to pay to the order of Richard Engstrom upon presentation of this voucher at forty-five days from date the sum of exactly $30,000, at the company's office, 27 School street, Room 227, or at any bank.

"The Securities Exchange Company,

"$30,000. By Charles Ponzi, B. R. B."

Thompson testified that he put the note into his desk and went away for a week, but on his return that he called up the defendant by telephone, and told him that Ponzi had left the note, and that the defendant said, "Take it back," or "Send it back," or something of that sort; that on several occasions afterwards he went to Mr. Ponzi's office, but could not see him, and therefore did not return the note, but kept it until the early part of August, when he delivered it to an auditor who had been appointed to examine into Mr. Ponzi's accounts.

The defendant testified that he knew nothing about the note until he was informed by Mr. Thompson that it had been left with him after the deed had been given, and that he then directed Thompson to return it. He also testified that a few days after this conversation with Thompson he again told Thompson to take the note back.

The certificate of deposit of the Tremont Trust Company which was given to the defendant was paid at its maturity on July 12, 1920, with $150 interest.

We cannot reconcile the defendant's testimony, that he had no knowledge that a note was to be given as part of the consideration for a deed of his property, with the fact that he accepted a certificate of deposit for $30,000, payable in 45 days, which would be the amount due upon the note at the expiration of that time, nor with the fact that he was receiving $4,000 more for his real estate than the sum for which his agent had written the broker it could be purchased and for which the latter had offered it to Ponzi.

No explanation of these facts was offered by the defendant, and we are forced to the conclusion that the defendant knew that in some way the benefit of his name as an investor with Ponzi was to be part of the consideration for a deed of his property.

The only evidence that Ponzi was engaged in a fraudulent scheme or was insolvent at the time of the conveyance to him, or of the negotiations which led up to it, was the testimony of an auditor who was employed to examine the books and accounts of Ponzi, and who testified in substance that there was no complete set of books which showed Ponzi's transactions. According to the books, the first note was issued on December 20, 1919, and between that date and August 9, 1920, the date on which an involuntary petition in bankruptcy was filed, notes showing an investment value (meaning amount invested) of $9,583,591.82 and of the face value of $14,374,755.59 had been issued; that there was no record showing the amount of cash paid out; that in some instances new notes were issued for notes that fell due, and that notes redeemed by cash and new notes had an invest-

ment value of $5,318,939.68 and a face value of $7,978,402.86; that the only other transactions shown by the books and vouchers were the investment of $200,000 or $300,000 in various companies and in loans or mortgages; that there was no record of assets and liabilities as of May 28, 1920, or during that month.

There was no direct evidence that the defendant or his agent, Thompson, had any knowledge of the nature of the business in which Ponzi was engaged, or that he was insolvent, or had reasonable cause to believe the same, or that Ponzi intended, by the transaction with the defendant, to hinder, delay, or defraud his creditors; but it is claimed that such knowledge on the part of the defendant may be fairly inferred from the admitted facts.

The defendant swore positively that he had never heard anything about Ponzi's business and knew nothing about it; that he had never heard of him until his name was mentioned by Thompson as a possible purchaser of his property; and that the only information that Thompson then gave him in regard to Ponzi was that he was engaged in some business of international exchange. Thompson testified that he did not know what business Ponzi was carrying on, but understood that he was "in some foreign exchange business, of whose details he had no knowledge whatever."

[1] The question whether a particular transfer is fraudulent under section 70e must be determined by the laws of the state which govern the transfer in question. In re Mullen (D. C.) 101 Fed. 413, 417; Holbrook v. International Trust Co., 220 Mass. 150, 154, 107 N. E. 665.

In re Mullen, supra, Judge Lowell said (101 Fed. at page 417):

"The right of the bankrupt's creditors to set aside the conveyance here in question was given by the law of Massachusetts, of which law the statute of 13 Eliz. is a part. See Bump, Fraud. Conv. § 12. The right originally given by the statute of 13 Eliz. has been in some respects modified by the statutes of Massachusetts, and the whole law upon the subject has been interpreted by the decisions of Massachusetts courts. By the interpretation put by those courts upon the law which gives the right I am bound. Schreyer v. Scott, 134 U. S. 405, 10 Sup. Ct. 579, 33 L. Ed. 955, and cases there cited."

[2] The Massachusetts decisions hold that, to set aside a transfer because in fraud of creditors, it must be shown that the purchaser, if paying a valuable consideration, had actual knowledge of or participated in the fraudulent purpose of the seller. Cohen v. Levy et al., 221 Mass. 336, 108 N. E. 1074. See, also, Wadsworth v. Williams, 100 Mass. 126; Pierce v. O'Brien, 189 Mass. 58, 75 N. E. 61; Gately v. Kappler, 209 Mass. 426, 431, 95 N. E. 859.

We cannot travel outside of the record, and in that there is no direct evidence that the defendant had actual knowledge that Ponzi was engaged in a fraudulent scheme, or that he was insolvent and intended by the payment which he made to the defendant "to hinder, delay, or defraud his creditors"; nor does it contain admitted facts from which knowledge can fairly be inferred.

It is contended, however, by the trustees, that the deed should be declared void because there was a material misunderstanding in regard to the terms of the sale; that Ponzi understood that the note for

$20,000, payable in 45 days, in the sum of $30,000, was to form part of the consideration for the deed, and that the certificate of deposit of the Tremont Trust Company was to be given to secure payment of the note, while the defendant testified that the note formed no part of the consideration, which was $9,000 in cash and the certificate of deposit of the Tremont Trust Company for $30,000.

As we have reached the conclusion that the defendant knew that the benefit of his name as an investor was part of the consideration, we think there was no material misunderstanding as to the terms of the sale.

The trustees further contend that the defendant, knowing that the Ponzi note was an essential part of the transaction, and that Ponzi's only reason for paying him $39,000 for his real estate was to get the use of his name as an investor, defrauded Ponzi of the advantage of the transaction, because he denied upon one occasion that he had invested any money with Ponzi, and therefore that the deed should be rescinded and the consideration which he received paid to the trustees.

Although the defendant testified that he made such a denial, the fact is undisputed that his name remained upon Ponzi's books as an investor, and that the note was retained by his attorney until after the petition in bankruptcy against Ponzi had been filed.

The decree of the District Court is reversed, and the case is remanded to that court, with direction to dismiss the bill, with costs to the appellant in this court and in the District Court.