BEAUMONT v. BEAUMONT (two cases).

(Circuit Court of Appeals, Third Circuit.   March 1, 1907.)

Nos. 66, 67.

1. GIFTS—GIFTS INTER VIVOS—DELIVERY—NECESSITY.
   It is essential to a completed gift that the donee should have such control, and such control only, of the subject-matter of the gift, as is consistent with the ownership purported to be transferred to him.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gifts, §§ 31, 34.]

2. SAME.
   Where delivery of property as a gift has once been made, and possession transferred, the gift is irrevocable, and is not affected by the fact that the donor immediately thereafter comes into physical possession and control of the property without any retransfer of the ownership by the donee.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gifts, § 20.]

3. SAME—CONDITIONS.
   A donor may attach a condition to a gift in presenti, if that condition be not inconsistent with possession or control by the donee of the thing given.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gifts, § 68.]

4. SAME—JOINT ACCESS TO PROPERTY BY DONOR AND DONEE.
   If a donor, with the clearly expressed intention of making a gift, make an actual delivery into the hands of the donee, the fact that the donor has lawful access to the depository of the thing given does not invalidate the gift, if the donee has also the same access to said depository, and has such control over the thing given that he may remove it at any time he chooses to do so.

5. SAME.
   The owner of 50 bonds rented a box of a safety deposit company in the name of himself and his two brothers, whom he took to the company, introduced them, and had them sign the contract of renting, and then retired with them to a room, taking the box and the bonds. He then handed one-half the bonds to each brother, stating that they were a gift, but that he desired the brothers to give him the coupons therefrom which should mature during his lifetime. After some conversation, they cut off some of the coupons next maturing, and gave them to him. They then placed the bonds and the coupons in the box, which was put in the vault; he taking one key, and giving them the other. *Held*, that the fact that he retained a key, and that he afterward visited the vault and took coupons from the box was not such a retention of control over the bonds as to invalidate the gift.

6. TRIAL—INSTRUCTIONS—CREDIBILITY OF TESTIMONY.
   An instruction *held* erroneous, in that it intimated to the jury that the testimony of a witness which was uncontradicted was inherently improbable, and was discredited by the cross-examination, which inferences were not warranted.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 414–419.]

In Error to the Circuit Court of the United States for the District of New Jersey.

See 144 Fed. 288.

Wm. Findley Brown and Gilbert Collins, for plaintiff in error.

John B. Leavitt, for defendant in error.

Before DALLAS and GRAY, Circuit Judges.

GRAY, Circuit Judge. The writs of error in these cases are to judgments in two separate actions of replevin, brought in the court below by the same plaintiff, who is the defendant in error in each. Both cases depended upon the same material facts, although in one, there was some testimony additional to that adduced in the other. Being so related as to both the facts and the law applicable thereto, they have been so argued, and may now be considered together.

The facts in evidence common to the two cases are as follows:

It appears that one Jacob A. Bostwick died about 1893 or 1894. For many years prior to his death, Lucius S. Beaumont, the intestate of the plaintiff below, had been Mr. Bostwick's confidential agent. From the date of the latter's death until October 23rd, 1901, Lucius S. Beaumont was the confidential agent of Mr. Bostwick's widow. On the last mentioned date, Mrs. Bostwick presented to Lucius S. Beaumont, then about sixty years of age and about to leave her employment, the sum of $50,000. On October 24th, 1901, Lucius S. Beaumont purchased fifty bonds of the New York Gas, Electric Light, Heat & Power Co., of the par value of one thousand dollars each, and made a partial payment thereon. On the same day, he also rented a box in the safety vault of the Lincoln Safe Deposit Company of New York (a different deposit company from that in which he kept his other valuables), in the names of himself and his two brothers, John and Charles. On October 25th, 1901, he paid the balance due on the bonds, secured possession of them, met his two brothers by previous arrangement, at the Grand Central Station in New York, took them to the office of the Lincoln Safe Deposit Company, introduced them to an employé of that company, had them sign the card containing the contract of renting, which he had signed on the previous day, and retired with them and the box to a small room. He then put his hand in his coat pocket, and, taking out a package, said: "Here, John, is 25 bonds, $1,000 each, I give to you," and handed them over to John. He then took out of his other pocket another package, and said: "Here, Charley, is 25 bonds, which I give to you. What I want you to do, is to give me the coupons,—cut off the coupons and give me the coupons of these bonds as long as I live." "He then said we were to go there once in six months cut them off, and then it was decided, as he was going to leave New York and going West, it would be inconvenient for us to get away from our work; that we had better cut off two or three years' coupons; we then cut off the coupons for two and a half years and gave them to him." He then put an elastic band around each six months' coupons and put them in an envelope. The next coupon was due February, 1902, and the coupons from February to February were cut off, which included February, 1904. He also said: "Sit down and take the numbers of the bonds and see if they are all right. Count

them and see if they are there," and this was done, John taking the numbers down as Charles called them off. John then put his bonds into the box and Charles, his, and Lucius put his coupons in. Charles then took up the box and carried it to the vault, where it was locked in its receptacle. One key was given to Charles for both the brothers, and the number of the box and the pass-word were communicated to them, Lucius telling them that they had access to the box when they pleased, but that he trusted them (presumably about the coupons). The other key was kept by Lucius. On being asked by one of his brothers whether his wife knew anything of the transaction, he said that she did not; that he did not want her to know; that she was otherwise provided for. He said: "She thinks Mrs. Bostwick has given me a pension, and I want her to think so, and on my death it ceases."

These, in the main, are the facts testified to in each suit by the brother of the defendant, the defendant himself being incapable, by reason of section 858 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 659], of testifying in his own behalf.

In the case against Charles Beaumont, there was some additional testimony in corroboration of that given by his brother John. The custodian of the vault of the Lincoln Safe Deposit Company testified that he knew Lucius in his lifetime, and that when he applied to him for a box in the safe deposit vault, Lucius told him, as explaining why he wanted it, of his gift from Mrs. Bostwick, and that he was going to present $25,000 to each of his brothers; that he spoke of it as an "absolute" or "outright" gift, and that he wanted to bring them there to sign for the box that he was about to rent. He also told him that he had provided for his wife, and how he had done so, and witness testified that he provided him, at his request, with a box of dimensions just sufficient to hold the two packages of bonds. Other minor facts and incidents were testified to by this witness, or were otherwise in evidence, which arguably corroborate the story of the brothers as to the gift of the bonds; but it is unnecessary to recite them here. The testimony of this witness (Carter) is criticised by counsel for defendant in error, as being confused and inconsistent with itself, and therefore unreliable. A careful examination, however, of this testimony, as it appears in the record, only discloses the fact that, upon crossexamination, the witness failed to appreciate the distinction between a gift outright of the bonds, and a gift to take effect at the death of the donor. This confusion does not seem to have been other than what was to be expected in the mind of a layman, subjected to a cross-examination on a distinction between gifts inter vivos and those which are intended to be testamentary in their character. His corroboration, however, of the testimony of the brothers, that Lucius intended in some way to give them these bonds, and had provided a box in a safe deposit vault, of which he gave them the key and in which they were to be deposited, is full and unequivocal. None of the witnesses were contradicted, discredited or impeached, otherwise than by the suggestion of the improbability of their story, in view of what was called the common experience of human nature under such circumstances, and the assignments of error raise a question as to the propriety of some

one or more of such suggestions as dealt with by the learned judge of the court below in his charge to the jury.

In both of these cases, there was a verdict for the plaintiff, a motion for a new trial, which was refused, and a judgment entered in pursuance of the verdict. In the case against Charles Beaumont, there are twenty-six assignments of error. We shall only discuss those which we think controlling and upon which our judgment is rested. In both cases, there was a motion that the court should charge the jury that, under all the evidence, their verdict should be for the defendant. Notwithstanding the fact that the testimony on behalf of the defendants was uncontradicted and unimpeached, we do not think, after a careful examination of the whole testimony, as disclosed in the record, that the court erred in refusing to so charge. It was for the jury to determine the weight of the evidence, and where there is any bona fide ground upon which it is assailed, the credibility of the testimony. There was also some question, which the court thought right to submit to the jury, touching the character of the control over the bonds conferred by Lucius on his brothers at the time of the alleged gift. We are not disposed to say that such a question should not have been submitted, though the manner of its submission may be open to criticism.

Turning to the record in the case against Charles Beaumont, we find twenty-six assignments of error. In the view we take, however, it is only necessary to now consider the 18th and 19th assignments. They are as follows:

"Eighteenth.—Because the court instructed the jury as follows:

'I have said to you and I again repeat that, if the testimony as to what took place in that little room leaves you in any uncertainty of mind, then you have the right to look at the subsequent conduct of the parties, and see if it is consistent with a gift on October 25, 1901; and I refer, therefore, to the fact that Mr. Carter says that Lucius came from Butler on one occasion and told him he was living on these coupons which came from the bonds he had given to his brothers.' "

"Nineteenth.—Because the court instructed the jury as follows:

'Well, furthermore, it appears that Lucius came from Butler on one occasion at least and went to the box and took some coupons out. What was his object? What did that act indicate or suggest? Did he reserve in himself a power and control over the bonds that were in that box? Did he reserve in himself the right to go there and cut off coupons from the bonds? If he did, then he reserved a control over the bonds and did not give up all control over them and consequently did not make a gift.' "

The underlying question of these assignments is, what are the essentials required by the law to constitute a valid gift of personal property inter vivos, in a case like the present? Undoubtedly, there must be shown an intention to give; that is, an expressed purpose to divest the donor of title in and ownership of the thing given, carried into effect and evidenced by a delivery of possession to the donee, and acceptance by him. It, of course, inheres in the conception of the possession essential to a completed gift, that the donee should have such control, and such control only, of the subject matter of the gift, as is consistent with the ownership purported to be transferred to him. What shall constitute the essential delivery, possession or control, must depend always on the circumstances of each case and the environment

of the parties. Where delivery of the property has once been made and possession transferred, the gift is irrevocable, and is not affected by the fact that the donee immediately thereafter comes into the physical possession and control of the property, without any retransfer of the ownership by the donee. Corle v. Monkhouse, 50 N. J. Eq. 537, 546, 25 Atl. 157; Matthews v. Hoagland, 48 N. J. Eq. 455, 485, 21 Atl. 1054. This being so, we see no reason why a gift should not be affected by a condition requiring temporary or partial control of the the thing given by the donor, where the intention to transfer the ownership is made clear, and a possession commensurate with that ownership conferred upon the donee.

In Industrial Trust Co. v. Scanlan, 58 Atl. 786, 26 R. I. 228, decided in 1904, it appears that one Patrick Scanlan went to the bank and asked if a deposit could be made payable there to him or his brother, Dennis, so that if either of them should die, it would then be payable to the survivor. The treasurer of the bank explained to him that in that way either could draw it if he had the book. Subsequently Patrick opened the account in the names of himself and brother, Dennis Scanlan, payable to either or the survivor of them, and Dennis, though not present at the time, went soon after to the bank and signed the signature book. Patrick gave the book to Dennis on the day of transfer, saying that it was his, to do as he pleased with, and that he could draw the whole or any part as he wished. Dennis continued to have possession of the book, except on two occasions when Patrick made withdrawals of different sums for his own use, returning the book after the withdrawals to Dennis. The court held it clear, that a gift from Patrick to Dennis was both intended and completed. In the course of its opinion, the court says:

"The argument against the vesting of a joint title in a donee is that, because the donor can defeat the gift by drawing the deposit, control of the deposit is thereby retained, and so the gift is not absolute and complete. To this, it may be replied that the donee has the same power, if he has possession of the book. Both parties cannot hold the book at the same time, and the mere fact that one has possession of it, ought not to be conclusive against the rights of the other. * * * Some cases go so far as to hold that the entry on the book of joint title, is self-operative, and that delivery of the book is not necessary (McElroy v. Natl. Sav. Bk., 8 App. Div. 192, 40 N. Y. Supp. 340), and that the retention of the right to draw the money deposited, does not affect the validity of the gift (Dennin v. Hilton [N. J. Eq.] 50 Atl. 600)."

It is true that, in the case just cited, the book, possession of which was necessary to enable either of the joint depositors to draw the money, had been delivered by the donor to his brother, but that, delivery once being made, completed the gift of the joint ownership intended by Patrick to Dennis, and thereafter, it mattered not who had possession of the book. The gift was complete by the expressed intention of Patrick and the delivery of the book and its having been returned by Dennis to Patrick without intention to retransfer his joint ownership, did not affect the validity of the gift, the Supreme Court saying, by Mr. Chief Justice Stiness:—"There can be no doubt that the owner of personal property has the right to give it away in whole or in part. Consequently, he can give a joint ownership to another." The court,

however, evidently would have been willing to go to the extent of the cases it cited, if the facts of the case at bar had made it necessary. In one of these cases, Dennin v. Hilton (N. J. Eq.) 50 Atl. 600, the donor deposited a certain amount of money in her own name and that of the donee, jointly, with the understanding stamped upon the account, that "This account and all money to be credited to it belongs to us as joint tenants, and will be the absolute property of the survivor of us, either and the survivor to draw." Afterwards, the donor delivered the deposit passbook to the donee. It was held by Vice Chancellor Pitney, that though the donor retained the right to draw the money deposited, her delivery of the depositor's passbook to the donee constituted an absolute delivery of the deposits to him, making the gift valid.

In Matthews v. Hoagland, supra, a father sent for his son and daughter. They went to his old home and were told to come up stairs, as he had something for them. They went up stairs with him, into his bedroom. He took his box out and took certain papers out of the box and handed them to them, saying: "Here, take these. Life is uncertain and they are yours." The papers consisted of certain mortgages he held against the daughter; also railroad stocks and bonds. The children then said they did not want to use the things given them then, and asked their father to keep them, and handed the papers back to him, and he replaced them in the box, putting the box back in his secretary. After this, the father collected the interest and dividends on these securities. It was held by Vice Chancellor Green that this constituted a valid gift to the children, saying in the course of his opinion (page 485 of 48 N. J. Eq., page 1065 of 21 Atl.):

"If the gift is complete, the whole title of the donor has passed from him to the donee and the subsequent redelivery of the subject matter of the gift to the donor, to keep for the donee, will not disturb the title of the latter in the thing given."

There is uncontradicted testimony in this case, that Lucius Beaumont not only intended to give and transfer the ownership of the bonds in question to his two brothers, but that he actually delivered the possession thereof to his brothers in the private room of the Safe Deposit Company, stating in substance that the bonds were theirs, although he intended to retain his property in the interest coupons during his life. If it be contended, as it is, that the retention of a key to the deposit box by Lucius, with the right to resort to it for the purpose of getting the coupons, was such a retention of control and possession as would enable him to carry the bonds away, and was therefore inconsistent with the idea of a gift of the same, it may be replied that the donee had the same possession and control and the same power of taking away the subject matter of the gift, and not only so, they had the rightful power to do so, as well as the physical opportunity. By the giving of the key of the box to his brothers, he evidenced his intention of making a gift in presenti of the bonds themselves, and gave them immediate possession and control. There is evidence that he did more than give the bonds and transfer the possession thereof, retaining his property and right to possession of the coupons. It is the testimony of the only person present competent to testify, that he gave the bonds and delivered the possession of the same, with the coupons attached,

to his brothers, intending that they should have possessory control of both, though coupled with a promise from them that they would cut off and deliver the interest coupons as they became due, to him during his life, and that in pursuance of that understanding, they actually did cut off and deliver to him all the coupons that were ever used by him, and also those that came due in the February after his death. We do not think, however, that it is necessary to so narrow the ground upon which such a gift, if gift it be, may rest, but that a donor may attach a condition to a gift in presenti, if that condition be not inconsistent with possession or control by the donee of the thing given. Why may not a father make a valid gift of a horse to his son, delivering possession and control thereof, on condition that the donor shall still have a limited use of the horse, with such control as is evidenced by a key to the stable? The control, incident to the possession given by Lucius Beaumont to his brothers, of these bonds, was complete. Their physical possession was such, that they could have carried them away from their place of deposit at any time, and the donor would have had no legal right to complain, so long as he was allowed to enjoy the interest as it accrued thereof. The possession and control of the bonds was exclusive, and not the less so in legal contemplation that the donor had also a key to their place of deposit, and could, in violation of their rights accruing from his gift, have carried them away. Such an act on his part, however, would have been a tort, if not a crime, and the physical opportunity of committing it, no more derogates from the complete right of ownership and possession in the donees, than would such an act committed by one who had no lawful access to the property. That the possession and control of the brothers was thus complete, was practically demonstrated by the fact that, after the death of Lucius Beaumont, they removed the bonds to depositories of their own selection.

It is sufficient for the facts of this case to say, if the donor, with the clearly expressed intention of making a gift, make an actual delivery into the hands of the donee, the fact that the donor has lawful access to the depository of the thing given, does not invalidate the gift, if the donee has also the same access to said depository, and has such control over the thing given, that he may remove it at any time he chooses to do so. The intention of the donor to give, and the once vesting physical control in the donee, are, we think, the crucial points in this case. So thinking, we must hold that the parts of the charge of the learned judge of the court below, covered by the 18th and 19th assignments, above quoted, were calculated to mislead the jury, as to the essential characteristics of a gift inter vivos, to the prejudice of the plaintiff in error. With great respect for the learned trial judge, we cannot agree that the fact that Mr. Carter said that Lucius came from Butler on one occasion, and told him that he was living on these coupons, which came from the bonds which he had given to his brothers, is inconsistent with a valid gift of these bonds to them, and yet the intimation is clearly given to the jury, by the language quoted in the 18th assignment, that such was the case. It may be that this intimation was not intended to be given, but the language used was clearly calculated to give the impression that any claim by Lucius, of

a right to take the coupons of these bonds from the safe deposit box, to which he had secured access by having a key with the consent of his brothers, was an exercise of control over the bonds which invalidated the gift. For the reasons stated, we think that, in the use of this language, there was error.

More direct and unequivocal still, is the language used in the charge, covered by the 19th assignment of error. After saying, categorically, that Lucius came from Butler on one occasion at least, and went to the box and took some coupons out, the jury is told, in effect, though it is put interrogatively, that that act indicated a control over the bonds reserved to himself, and that, consequently, he did not make a gift. It is hard to believe that this language, coming from the learned trial judge, did not absolutely control the action of the jury, and, as we think, to the prejudice of the plaintiff in error. We have examined, not only the context of the parts of the charge recited in the assignments above referred to, but, the whole charge, to see whether the language here criticised has been qualified or explained. We find, however, and are not surprised to find, that the charge of the learned trial judge is consistent throughout, and that the language excepted to must be attributed to a view of what is required to make a valid gift inter vivos, that differs from what we conceive to be the true one. We know of no rule of law by which the dissociation of the interest or coupons on these bonds, and their reservation to the donor for the purposes of the gift, would invalidate a gift of the bonds themselves to the donees, as testified to by the brother of the plaintiff in error. We do not think it is necessary to review the many cases cited by the learned counsel for the plaintiff in error (most of which we have examined), which support the conclusion at which we have arrived.

Finding error in the respects stated, the judgment below is reversed, with instructions to award a venire de novo.

In the case against John L. Beaumont, there are seven assignments of error. It will only be necessary to consider the first and second. They are as follows:

"First. Because the court instructed the jury, with reference to the testimony of Charles Beaumont as to what Lucius S. Beaumont said and did at the time of the alleged gift, as follows:

'You have no right to reject except for good reasons—reasons perfectly satisfactory to you'; adding the following words on that subject: 'You have no right, as counsel for defendant argued in this case, to ignore credible, unimpeached and uncontradicted testimony adduced by the defendant, and if you regard Charles' testimony or any other testimony produced by the defendant in relation to the alleged gift as credible, unimpeached and uncontradicted testimony, why, of course, you cannot ignore it or disregard it, but the facts of this case are such that I feel very sure I would not be justified in saying to you that you were bound to accept as absolute truth all that Charles has testified to. Testimony must be credible in its nature to be influential and must come from a credible source. You are bound, I repeat, to consider very carefully the testimony given by Charles. It is testimony of a most vital character in this case, but as was said by the Supreme Court of New Jersey in the case which I have referred to—I refer to the case of Cooley v. Barcroft, in 43 N. J. Law, 363: "The character of a witness or a number of witnesses may be so impeached, or their story so shattered by cross-examination or rendered so doubtful by inherent improbabilities, that their testimony, standing unopposed by direct counter testimony, would be fairly subjected to suspicion.

No court upon review could say, as a legal conclusion, that, under such circumstances, a judgment which ignored such testimony was illegal." ' "

"Second. Because the court instructed the jury that:

'If, however, you are of the opinion that the transaction was one which Lucius intended to reserve a control over these bonds, during his lifetime, and that that accounts for the fact that this box was rented, not only in the names of his two brothers, but in his own as well—if you are of opinion that he intended to retain a control over these bonds during his lifetime and to assert the right of cutting off these coupons from time to time during his lifetime, as they matured, then Lucius did not part with all control over them and he did not make a valid gift. It may be that he intended that the bonds should go to John after his death, and if that is what he intended then the gift is void, and your verdict should be for the plaintiff, because he could not give the bonds in that way except by will.' "

We think the language used by the learned trial judge, as recited in the first assignment, while quite accurately stating, as an abstract proposition, the rights and duty of the jury in regard to credible, unimpeached and uncontradicted testimony, was on the whole, when taken in connection with the allusions made to the testimony of Charles Beaumont, calculated to prejudice the jury unduly against the plaintiff in error. We do not think that any inference could have been drawn by the jury from this part of the charge, other than that, in the opinion of the learned trial judge, the testimony of Charles Beaumont should be considered as inherently improbable, and that the truth of his story had been shattered by cross-examination, and that they were justified in rejecting it. A careful reading of this testimony has not disclosed to us any ground for such an inference. We do not discover that there is inherent improbability in the story of Charles, or that that story has been shattered by cross-examination. Although the trial judge does not directly assert these things, it seems to be suggested by the manner in which the instruction is framed.

The part of the charge recited in the second assignment, is open to the criticism we have already made in the other case, of the view apparently taken by the learned trial judge, of what is requisite to a gift inter vivos. We do not think that, even if there was evidence that Lucius intended to reserve such a control over these bonds during his lifetime, as would enable him to assert his right of cutting off the coupons for interest from time to time, he thereby invalidated the gift of the bonds which he evidently intended to make to his brothers. We need not again discuss what we consider as essential or nonessential to the making of such a gift as was intended to be made by Lucius to his brothers, according to their testimony. It suffices to say that we think that the instruction excepted to was calculated to give the jury the erroneous impression that, if Lucius Beaumont asserted the right of cutting off these coupons from time to time, during his lifetime, and for that purpose had reserved to himself the right of access to the box in which they were placed, under the circumstances shown by the evidence, there was no valid gift of the bonds. It is true that the instruction is prefaced with the assumption that the jury should be of the opinion that the transaction was one in which "Lucius intended to reserve a control over these bonds," but the evidence of that control, as put by the learned trial judge, was made to appear to the jury to be the right asserted by Lucius (which was not denied by the donees

of the bonds) to take the coupons out of the box from time to time, whether they were those which were cut off by the brothers and handed to'him after the gift, or those which were still attached to the bonds.

The last sentence of the part of the charge recited in this second assignment, was also, we think, likely to unduly influence the jury against the defendants. The line of demarcation between gifts in presenti and inter vivos, and those which are intended to take effect at the death of the donor, and which are invalid by reason of their testamentary character, is often so shifting and uncertain, that it would seem that a jury, if they wanted the plaintiff in this case to succeed, could easily avail themselves of this alternative presented by the trial judge, however far that might have been from his purpose. We do not think the testimony in the case justified the suggestion, and if it had, the difference between the two transactions should have been more clearly distinguished and guarded. It is not without significance that the trial judge did not himself seem to have been able to escape the conclusion, that there was an intention on the part of Lucius that his brothers should have the ownership of these bonds, if he could have the interest thereon for his life. We do not think that this clear intention on the part of Lucius Beaumont should be or can be defeated by the technical suggestion of so construing the gift intended to be made, as that it should be void as an attempted testamentary disposition of the bonds. There is no testimony as to what occurred between the three brothers in relation to these bonds, except that of the two brothers, who undeniably had possession of them at the death of Lucius, and the important corroborating testimony of Carter, the custodian of the safe deposit vault, in the suit against Charles. If the story of the two brothers is to be accepted, there was a valid gift in presenti to them, by Lucius, of the bonds in question, reserving to himself, by condition subsequent, the right to the interest coupons thereon during his life, or stipulating with his brothers, after the gift, that they should, from time to time during his life, detach these coupons and deliver them to him. But if this story is not to be accepted, as told, it seems to us it must be rejected in toto, as it is not susceptible of a different interpretation from that above given.

The judgment below in each of these cases is therefore reversed, with instructions for the award of a venire de novo.