James J. McGovern, Ex'r.,
By Timothy A. Dailey,
et al.
vs.
Pierre G. Morin, et al. } Eq. No. 12238.

February 3, 1934.

CHURCHILL, J. Heard on bill, answer and proof.

This is a bill in equity brought in the name of James J. McGovern, Executor of the Will of Hanora J. Cooper, by persons legally interested in her estate, under the provisions of Chap. 363, Sec. 52, Gen. Laws of 1923, for the benefit of the estate.

All the formalities provided by the statute have been complied with.

The bill sets forth that Hanora J. Cooper during her lifetime and at the time of her death was the owner of certain securities which are assets of the estate and that they are now in the possession of the respondent Morin.

The answer sets up title to the securities in the respondent Morin by gift of Hanora J. Cooper.

It is stipulated by the parties that the market value of the securities at the time of the alleged gift was $8,500. They are coupon bonds passing by delivery.

That a confidential relationship existed between Morin and Mrs. Cooper is admitted by all parties to the controversy.

The burden of proof where a party is claiming title by way of gift and where confidential relationship exists has recently been stated thus:

"It is elementary that a person occupying a position of trust and confidence has the burden of showing that no advantage was taken of the donor. It is well established that the person who sets up a gift has the burden of proof that the gift was actual."

*Union Trust Co.*, vs. *Davies*, 53 R. I. 63.

It is incumbent, therefore, to examine with a close scrutiny the testimony on which the respondent rests his claim to title.

Mrs. Cooper's husband died in 1922 and at the time of her death on October 8, 1932, she was 55 years of age. Her fortune came to her from her husband and was increased by her after his death so that at the time of her death it stood, exclusive of the securities in question, at over $28,000, in addition to which she owned a two-family house, free from encumbrances, located on Ohio Avenue in the City of Providence.

She carried on her financial affairs through the brokerage firm of Anderson & Company in Providence, to which firm she made frequent visits. She handled her own business affairs with competency and discretion throughout all the times involved in this case. She was not in the habit of discussing her financial affairs or the amount of her possessions with her friends, but preferred to rely on her business advisors, Anderson & Company.

Pierre G. Morin was unmarried and somewhat younger than Mrs. Cooper, and from 1931 operated an automobile service station on Eddy Street in the City of Providence. His means were limited and at times he was forced to borrow on his life insurance policies. Meeting Mrs. Cooper in 1922, their acquaintance ripened into friendship and then developed to a point where marriage was a subject of conversation between them, but the testimony does not warrant a finding that an engagement to marry ever existed between them.

Mrs. Cooper lived alone and for some time previous to August 18, 1932, Morin was in the habit of doing work around the house, such as attending to the furnace, cleaning the sidewalk, trimming hedges, and making small repairs on the house. He took Mrs. Cooper to church in an automobile, drove to other places where she had occasion to go; frequently taking her to the business center of Providence on her business trips; wrote many of her letters at her dictation and attended to the mechanical details of her business, such as making bank deposits and making out rent receipts. There is no testimony that he ever advised or sought to advise her about her business affairs or investments, or that she ever sought his advice on such matters.

Of some importance in its bearing on the issues in this case is the fact that she was not on intimate terms with her relations. That Morin had caused this apparent estrangement or that he ever disparaged her relations to her is not shown by any testimony.

Mrs. Cooper was thus apparently a rather lonely woman, living apart from her relations and without a wide circle of intimate friends. Her friendship for Morin is, under the circumstances, perfectly explicable and human.

The Court finds that for some years prior to August 18, 1932, the date of the alleged gift, and down to the time of Mrs. Cooper's death in the following October, the relations between Morin and Mrs. Cooper were confidential but that at no time during that period did he act as her business adviser, nor did he give her, nor seek to give her, nor did she request advice on matters of business, on the investment of her funds or on the management of her property.

With this background, we come to the events of August 18, 1932.

She had received a letter from Anderson & Company on August 17, 1933. On the afternoon of that day, she requested Morin to take her down town the next day. He arrived at the house somewhere about the noon hour and took her to the Rhode Island Hospital Trust Company building in Providence and to the Industrial Trust Company building, where she consulted with her brokers, Anderson & Company. Just where Morin was during that time is disputed, but it is clear on all the evidence that, whether he remained in the automobile or whether he went to the floor on which the suite occupied by Anderson & Company was located, he did not go into the office of Anderson & Company and took no part in any conference which Mrs. Cooper had there with a member of the firm.

There is nothing on which the Court can base any inference that the nature of her visit to Anderson & Company's office was discussed between Morin and Mrs. Cooper. On leaving the Industrial Trust Company building, she directed Morin to make a deposit for her of $500 in the Providence National Bank, handing to him five $100 bills and her pass-book and a deposit slip. He executed the errand, returned to the automobile and then took her back to the Rhode Island Hospital Trust Company building. She returned, saying that she was tired, and directed Morin to drive her home. They went by way of Dyer and Eddy Streets. Mrs. Cooper sat in the rear seat of the automobile. It was a sport sedan model with the rear seat nearer the front seat than the ordinary sedan type of car. What took place can best be described by the words of the respondent:

"A. Well, when we went up Eddy Street in the vicinity of Public Street and Potter Avenue, she leaned over, she said, 'Gregory, I am going to the hospital tomorrow, here are my bonds. I wish you to have them. They are mine—they are yours.'

"151 Q. Now prior to that time had she advised you that she was going to give you what she gave you then? A. No, sir.

"152 Q. What did you say? A. I said, 'Thank you.'

"153 Q. What did you do with them? A. Why—

"154 Q. At that time. At that time you mean?

"155 Q. What did you do with them right when she gave them to you? A. I put them inside my pocket.

"156 Q. How were they—in an envelope or what? A. There was a rubber band around them.

"157 Q. All right. Did you know at that time what they were? A. Well, they looked like bonds to me but I wasn't sure.

"158 Q. I mean, what kind of bonds. A. No."

On cross-examination he testified that between Public Street and Potter's Avenue, Mrs. Cooper said: "Gregory, I am going to the hospital tomorrow. Here are my bonds. I want you to have them. They are yours," and that he replied, "I thank you." Morin then, as he says, wishing to deposit the bonds in a safe place, said, "I will leave these in the Industrial Trust Company's Washington Park branch." He drove up there, hired a safe deposit box which was rented by him in the joint names of Mrs. Cooper and Morin, and the bonds were deposited therein. He testified that he kept both keys from that time until Mrs. Cooper's death.

The evidence is in dispute as to what occurred at the Washington Park Branch when the safe deposit box was rented and the bonds deposited. Morin testifies that after the lease was made out, signed by him and paid for from his own funds, it occurred to him that "Mrs. Cooper giving me the bonds as a gift, I would like her to have access to the box in case anything happened to me before her." With this thought in mind, he testified he interrogated the clerk having charge of the matter for the Trust Company as to whether a joint lease could be arranged. The result was that Mrs. Cooper's name was added to the lease. He stated that he took the lease out to Mrs. Cooper, who remained in the car, and that she signed it there. That portion of Morin's testimony relating to the manner in which the joint account was opened was contradicted by the clerk in charge of the matter for the company, but the fact that Morin con-

ducted all the negotiations, paid the rent for the box, deposited the bonds, and that Mrs. Cooper signed the lease in the automobile and took no part in the negotiations for the box, are points which are uncontradicted.

After August 18, 1932, insurance policies and documents relating to a burial lot in Swan Point Cemetery belonging to Mrs. Cooper, were placed in the box by Morin, but, as far as the evidence shows, Mrs. Cooper, from August 18, 1932, to the time of her death never exercised control, or attempted to exercise control, over the bonds which were delivered to Morin on August 18, 1932, and there is no evidence that between those dates she ever cashed any coupons attached to the bonds or requested Morin to cash such coupons for her. In fact no coupons became due in this interval. The bonds remained in the safe deposit box until a few days before Mrs. Cooper's death, when they were taken out by Morin and deposited in the Citizens Safe Deposit Company where they now are. At the time it was done, Morin left in the safe deposit box at the Washington Park branch of the Industrial Trust Company various documents which he stated belonged to Mrs. Cooper.

A severe attack is made on the credibility of Morin, based on contradictions in his own testimony at the hearing and on contradictions between his testimony at the hearing in the case at bar and the testimony given by him in the Probate Court at the time the will of Mrs. Cooper was offered for probate. Space forbids an examination of these various matters tending to weaken his testimony. To assay correctly the value of the testimony other elements require attention. The Court has taken into consideration, for instance, Morin's conduct after August 18, 1932, and down to and after the death of Mrs. Cooper.

Mrs. Cooper went to the Homeopathic Hospital on August 19, 1932, and remained there until September 23, 1932. During that time Morin was entrusted with the conduct of her home and the payment of bills of Mrs. Cooper, and to that end she gave him a number of checks in blank signed by her. The testimony warrants a finding that he honestly carried out the duties with which he was entrusted by Mrs. Cooper, as he accounted for everything which was spent and returned the balance to either the custodian or the executor. In addition to this he turned over to the executor various sums of money which belonged to Mrs. Cooper and were in the house at the time of her death, small pieces of jewelry and the like. His conduct in these important matters was that of a man who could be trusted and must be taken into account in weighing his testimony on the stand, and in passing on the charges which are levelled against him by counsel. He impressed the Court not as a shrewd, capable man, able to take care of himself in the strange surroundings of the court room, but rather as one who did not altogether grasp the significance or meaning of various questions which were put to him in cross-examination.

It is strongly urged that the details given by Morin as to the time, place and circumstances of the alleged gift are so improbable in themselves as to warrant the Court in rejecting the testimony altogether.

Human conduct is so various and unpredictable that ordinarily a trial court is not justified in absolutely refusing credence to a witness because his testimony does not conform to some assumed standard of human behavior. It suggests caution in weighing testimony rather than rejection.

Taking all the factors into consideration, the Court cannot reject the

testimony of Morin, nor can it say that on the essential points it is absolutely unworthy of credence.

However, under the rigorous rule of *Union Trust Co.* vs. *Davies*, 53 R. I. 63, it may be assumed that his testimony requires corroboration.

Mrs. Cooper went to the Homeopathic Hospital on August 19, 1932, and remained there until September 23, 1932. She was afflicted with a cancer from which she died later.

While she was at the hospital, she was attended by a Mrs. Anna E. Day, who was not related to her and whom she had never met up to the time she was introducted to her at the hospital. Mrs. Day testified in substance that while she was attending Mrs. Cooper at the hospital, Mrs. Cooper spoke of Morin quite frequently, calling him Gregory, saying that he was a dear friend of hers; that he was the only one who had been kind to her for a long time and "she said that if she should die, he was going to get all her money, besides 'I have given him bonds.'" On another occasion when the witness remarked that Gregory came every day and every night to see her and that she was taking him away from his business, Mrs. Cooper said: "He is not actually poor, I gave him those bonds."

The testimony of this witness is vigorously assailed on the ground that she is an interested party, taking $500 under the will of Mrs. Cooper, and is now on terms of intimate friendship with Morin, and, further, that her testimony is not in all respects the same as her testimony in the Probate Court. In spite of these matters, which counsel urge should induce the Court to disregard her testimony, it must be said that although it may not amount to full corroboration, yet it adds something to the strength of the case for the respondent and the Court would not be justified in rejecting it in toto.

There remains to be considered the testimony of James J. McGovern.

Mr. McGovern had been counsel for the Cooper family and had done some professional work for Mrs. Cooper. He stated that as a result of the work which he had done for her, he deemed her to be an intelligent woman. He was called on the telephone on the afternoon of the 7th of October, 1932. Morin came for him and took him to Mrs. Cooper's house in his automobile. Mr. McGovern went into her bedroom, the door of which was closed at the time of his conference with her. He and Mrs. Cooper were the only occupants of the room. She told him she was about to die; that the doctor had so informed her. She appeared depressed and sad but talked normally and appeared to be in a state of mind competent to dispose of her property. She gave him the names of her relatives and when asked about her property, she said that she owned the house, that there was no mortgage on it, mentioned her bank account and said she had had some bonds, and added: "I haven't got them now; I have given them to Gregory." On being asked by Mr. McGovern who Gregory was, she replied: "The man who brought you down," and then went on to say that she had given them to him some time before and that they had cost in the neighborhood of $8,000. Mr. McGovern then asked her where she had bought the bonds and she said, "Anderson & Company." Mr. McGovern, in the course of the afternoon, called Anderson & Company on the telephone and corroborated her statement. In the kitchen Mr. McGovern had some conversation with Morin. Both men then went back to the bedroom where Mrs. Cooper was. Morin stood in the doorway and Mr. McGovern then asked Mrs. Cooper again if she had given Morin the bonds and she said she had. During the course of the

conversation that afternoon, Mrs. Cooper told Mr. McGovern that she had given the bonds to Gregory because he had been good to her.

Mr. McGovern characterized Mrs. Cooper's mental condition as normal and that she had an intelligent grasp of business matters and that under such conditions he drew her will and had it executed by her on that day.

By this document Mrs. Cooper made bequests, among others, to her two brothers in the sum of $2,500 each, to the children of a deceased sister $300 each, to Mrs. Day $500, various bequests of jewelry and to Pierre G. Morin, the respondent, she gave her house and the contents thereof "in recognition of many kindnesses shown her," and she also made him the residuary legatee under the will.

Mr. McGovern's testimony, clear and not shaken and coming as it does from a lawyer of his standing and character, the Court accepts as true.

The Court finds, as a fact, that on October 7, 1932, at the time of the interview between Mrs. Cooper and Mr. McGovern, and during the entire time of such interview, Mrs. Cooper was in a rational state of mind and that she voluntarily made the statements to Mr. McGovern in respect to the gift of the bonds to Morin, to which he, Mr. McGovern, testified.

The complainant takes the point that title did not vest because the lease of the safe deposit box at the Washington Park Branch of the Industrial Trust Company was in the joint names of Morin and Mrs. Cooper. While the fact that a joint lease of the safe deposit box in which the bonds were deposited was made shortly after the alleged gift was consummated and that such lease was made either at the direction of Morin or with his consent is evidence to be taken into consideration in passing on the ultimate question as to whether Mrs. Cooper made an absolute gift of the bonds or not, such evidence is by no means conclusive on the point.

Where a gift has actually been made and consummated, the fact that the donor has access to the place where the property is deposited does not render the gift invalid, particularly where the donee has like access to the place of deposit. It may be remembered, in passing upon this point, that Morin testified that he kept in his own control both keys to the deposit box after the lease was made.

For a well reasoned case closely in point see

> *Beaumont* vs. *Beaumont*, 152 Fed. 55.

The complainant also argues that the testimony of Morin that he caused a joint lease of the safe deposit box to be made because he had an idea that if he died before Mrs. Cooper she could have access to the box and obtain the bonds is fatal to the alleged gift.

While these facts are to be taken into consideration in passing on the question as to whether or not a delivery of the bonds was made with intent to vest absolute title, they are not conclusive on the question. If once title passed from Mrs. Cooper by delivery of the securities to Morin with intent to convey absolute title on her part, what Morin desired or thought he could do with the securities afterwards or what his ideas were as to a method whereby Mrs. Cooper could be reinvested with the title in the event of his prior death, such facts cannot in and of themselves render invalid a precedent absolute gift if one was so made by her. If the securities belonged to Morin, he had the right to dispose of them or arrange for their disposition as he saw fit.

Taking all the facts into consideration, the Court finds it is clearly established that Mrs. Hanora J. Cooper,

on August 18, 1932, made delivery of the securities in question to Pierre G. Morin with intent to vest in him by way of gift the absolute title to said securities, and that she parted definitely with control of said securities at that time and never resumed, or attempted to resume, control of any character over said securities thereafter, but that they remained thereafter in the exclusive possession and control of Pierre G. Morin.

There remains to be considered the question of undue influence. The testimony previously reviewed would seem to dispel any serious suspicion that Morin exerted any undue influence over Mrs. Cooper in respect to the gift of the securities which she made, but in view of the argument made on behalf of the complainant, some further findings seem to be called for.

It is clear from the evidence that Mrs. Cooper was an intelligent woman and it is likewise clear and the Court so finds, that up to and on the 18th day of August, 1932, and at all times up to and including October 7, 1932, she was in full possession of her mental faculties. There is no evidence of any kind tending to show that at any time Morin had persuaded her to take action of any important character either in relation to business affairs or otherwise. In fact, from the testimony in regard to Mrs. Cooper's characteristics and the testimony which throws light on the relations between Morin and Mrs. Cooper, it is rather clear that Mrs. Cooper was the dominating personality.

Further, Mrs. Cooper being estranged from, or at least not on cordial terms with, her relations, and being on terms of intimate friendship with Morin, and, as demonstrated by testimony indisputable in its character, being grateful for what he had done for her, her conduct in making the gift and the motive that actuated it become perfectly clear.

The complainant has cited *Citizens Savings Bank* vs. *Mitchell*, 18 R. I. 739, and *Schuyler* vs. *Stephen*, 28 R. I. 507. Each case involved a gift causa mortis, while in the case at bar both sides agree that the transaction of August 18, 1932, was not a gift causa mortis. Whether the rule as to the quantum of proof necessary to support a gift causa mortis also applies to a gift inter vivos, where the relationship is confidential, it is not material to discuss in view of the findings of fact herein contained. Both the Mitchell case and the Schuyler case differ substantially from the case at bar. In each case the donor by a will had expressed an intent to benefit certain persons, which intent was totally at variance with the alleged gift. In both cases the gifts materially diminished the amount provided for under the will. The Court found no adequate reason for the change of purpose in either case on the part of the donor. These facts weighed heavily in the opinion of the Court against the donee in each case and warranted a finding against the alleged gift.

In the case at bar all the declarations of Mrs. Cooper and her intent as shown by her will are consistent with the gift to Morin. There is no substantial indication of an intent or purpose on her part, relating to the disposition of her property, inconsistent therewith.

Taking all the facts into consideration, the Court finds that the respondent Pierre G. Morin has established clearly and beyond doubt that the gift of the securities to him made on August 18, 1932, by Mrs. Cooper was made as the result of her own volition free from the exercise of undue influence by him on her and free from and without any improper practice or

act on his part inducing her to make such a gift.

The findings and rulings made above require a decree for the respondent Morin, declaring title in the securities described in the bill of complaint to be in him and that the bill of complaint be denied and dismissed.

For complainant: George Hurley, Hartigan, Mullen & Roberts, J. F. Collins.

For respondents: Comstock & Canning; Henshaw, Lindemuth & Baker.