## LYNCH v. LA FONTE et al.
### No. 1143.

District Court, S. D. California, Central Division.

March 10, 1941.

Rupert B. Turnbull and Nat Rosenstein, both of Los Angeles, Cal., for plaintiff.

Lorrin Andrews and E. Walter Guthrie, both of Los Angeles, Cal., for defendant.

O'CONNOR, District Judge.

The plaintiff, E. A. Lynch, as trustee in bankruptcy of the estate of Herbert M. Horkheimer, a bankrupt, alleges that the bankrupt purchased real property in that portion of the City of Los Angeles known as Van Nuys, approximately five acres in extent, in the County of Los Angeles, State of California, described as follows, to-wit: "Tract 1000, and East 305 ft. of Lot 394 and East 305 feet of Lot 395, Van Nuys, California containing 4.42 acres, as per book 19, pages 1–34 of Maps, Records of Los Angeles County, State of California, commonly known as No. 14115 Magnolia Boulevard, Los Angeles County, California, in Van Nuys, California."

That the purchase price paid by the bankrupt for said property, unimproved, was the sum of $5,000 and the title was made in the name of the defendant, Dorothea Louise LaFonte for the convenience of said Herbert M. Horkheimer, bankrupt; and that no part of the purchase price was contributed by Dorothea Louise LaFonte, and alleges further that the said purchaser, Herbert M. Horkheimer, caused to be erected and built upon said property a residence costing approximately $25,000, all of said sum being contributed by the bankrupt and none by the defendant, Dorothea Louise LaFonte; and further alleges that said bankrupt inherited from his mother, in 1935, ten Oriental rugs, silverware and china, and that he placed the same within said residence and that said rugs are now in and upon the floors of said property and said silverware and china are now also within said property.

Further, plaintiff alleges that certain furniture was purchased and paid for by Herbert M. Horkheimer and placed therein, and that a certain trust deed, which was place on said real property to secure certain sums of money used to complete buildings on said property, was joined in by Horkheimer and the defendant, and also that certain water-heating equipment and other fixtures were installed therein and paid for by Horkheimer.

It is further alleged that Horkheimer has creditors to the extent of approximately $25,000 without property to pay the same and the complaint refers to the matter of Horkheimer, a bankrupt, file No. 36325–C In Bankruptcy.

The uncontradicted testimony discloses that Horkheimer gave to the defendant, LaFonte, $30,000 in September, 1935, and that this sum was deposited in a safety deposit box of defendant, LaFonte; that LaFonte executed a written order authorizing Horkheimer to have access to said box; that on May 27, 1936, the sum of $5,000 was taken out of said safety deposit box and deposited in the Security First National Bank, North Hollywood Branch (plaintiff's exhibit 20), in the name of defendant, LaFonte; that, from time to time, various amounts were deposited to the account of defendant, LaFonte, in said bank and also in the LaBrea and Wilshire Branch of the Security First National Bank by Horkheimer at the request of LaFonte.

On August 20, 1935, Horkheimer received stocks and bonds and cash in the

sum of about $10,000 from the estate of his mother. Articles of personal property received by Horkheimer were shipped from New Jersey to Los Angeles, (plaintiff's exhibit 14), bill of lading made to LaFonte, September 16, 1935. Real estate received by Horkheimer from said estate was deeded by him to his brother, Elwood.

The $5,000 deposited on May 27, 1936, in the account of LaFonte was used to purchase a five-acre tract described in the complaint and the balance of the $30,000 was used to construct the house, as were the funds borrowed, which were secured by a trust deed on the premises amounting to $16,000, (defendant's exhibit F). The defendant, LaFonte, received a deed direct from the record owner, May 17, 1936.

At the time this money was borrowed, Horkheimer made it clear to the Prudential Insurance Company, the loaning company, that he would become obligated with LaFonte provided that it would not be any evidence of any ownership in the real property, which he said he did not have. The proceeds of this loan were used to pay bills for labor, material and miscellaneous items which went into the house and to repay money to Chaney in the sum of $4,144 and to Lillian R. Bernstein in the sum of $6,252. No cash was paid to LaFonte or to Horkheimer. The ten Oriental rugs and the silverware and china inherited by Horkheimer were given to LaFonte. Horkheimer testifies, and there is no evidence to the contrary, that, at the time he gave the $30,000 and the items of personal property to LaFonte, he still had about $40,000 or $50,000 cash of his own. Horkheimer's father died in 1910 and left an estate of between $250,000 and $300,000 and his mother gave him various amounts of money at different times, in sums of $500 and as high as $20,000; and he made no income tax returns in 1935, 1936, 1937, 1938 or 1939 for the reason that he had no income.

At the time of the gift of the $30,000 by Horkheimer to LaFonte, Horkheimer had no creditors. He was not engaged in business; he did not contemplate entering into any speculative venture which might jeopardize his capital. The five acres was purchased by LaFonte and the whole world had notice of the claims of ownership both of record and by possession. Horkheimer did not live in the house until about April or May, 1940. The involuntary petition in bankruptcy against Horkheimer was filed on May 9, 1940. LaFonte testifies that Horkheimer had no money, and for that reason came to her house where, at various times, her mother and sister lived with her. Horkheimer divorced his wife in 1914 and made a settlement with her by making a payment to her of $100,000 and a payment to his daughter of $50,000.

The court's attention was called to the bankruptcy file, Herbert M. Horkheimer, 36325–C. The trustee contends that in the trial the jury found that the placing of this property in the name of LaFonte was concealment. "They cannot and do not tell the same story in this court as they told to the bankruptcy referee or to the jury in the Horkheimer bankruptcy case, where said jury found that it was in fact a concealment." (See plaintiff's brief, page 13.)

The court has carefully examined the file in the bankruptcy trial and finds that four acts of bankruptcy were alleged. Act of bankruptcy No. 1: a preference payment of $100 to the Ambassador Hotel Operating Company. Act of bankruptcy No. 2: concealment of the real property in issue in this case in the name of LaFonte. Act of bankruptcy No. 3: the concealment of furnishings, furniture and equipment at 14115 Magnolia Boulevard, Van Nuys, being the premises in question in this action. Act of bankruptcy No. 4: concealment of certain oil royalty interests in the name of LaFonte. The petitioning creditors requested instruction to the jury setting forth in detail the alleged four acts of bankruptcy and requested the court to instruct as follows: "The court instructs you that it is not necessary in order for you to find a verdict in favor of petitioning creditors, for you to find that each and all of said alleged acts of bankruptcy were committed by Horkheimer and have been proven. If you find that any of said acts has been proven and, in addition, you find that Horkheimer, at the time of filing the creditor's petition therein owed provable unsecured debts in excess of $1,000. * * *"

Only that part of the instruction pertinent to the inquiry is quoted. The court gave this instruction together with many other instructions requested by the plaintiff. The verdict of the jury was as follows: "We, the jury, in the above entitled bankruptcy matter, find the issues in favor of the petitioning creditors." (Dated Los Angeles, California, August 8, 1940. Charles S. Kendall, Foreman of the Jury.)

502

Under the court's instructions, the jury could return such a verdict by finding that any one or more of the acts of bankruptcy has been committed and the verdict does not specify which of the acts of bankruptcy were proven.

It could not be contended that at the time the $30,000 was given to LaFonte by Horkheimer anyone was injured. Horkheimer had no creditors at that time. In fact, the plaintiff strenuously contends that Horkheimer had no business for some years prior to 1935 and since 1935, except a few casual transactions.

The subsequent creditors represented by plaintiff Lynch as trustee did not extend credit or make advances to Horkheimer relying upon the property in question. The first creditors became such approximately two years after the gift. The court was not furnished with the dates when each of the obligations was incurred by Horkheimer, and the allegations in several of the complaints filed against him in state courts, stated that the indebtedness was incurred within two years of the filing of the complaint. However, the dates on which some of the larger items were incurred by Horkheimer were established. The Josephine Corbett (now bankrupt) obligation of $10,000 was for money advanced during the latter part of 1938 and 1939. The money advanced by Mrs. Maud Gilmore amounting to $8,732 was advanced between October 20, 1938, and December 8, 1939. The indebtedness to W. D. Gilmore of $1,680 was incurred on December 8, 1939. The indebtedness to Ben Bard of $1,117.36 was incurred in 1937.

▇▇▇ In Beaumont v. Beaumont, 3 Cir., 152 F. 55, 58, Lucius S. Beaumont took his two brothers, John and Charles, to the Lincoln Safe Deposit Company in New York and had them sign the card containing contract of renting safety deposit box which he had signed the previous day, handed each of the two brothers twenty-five bonds of $1,000 each and stated that he gave them to each of his brothers but desired to reserve the coupons for himself so long as he lived. Two or three years' coupons were then cut off and retained by Lucius. Lucius retained one key and one key was delivered to his brother, Charles, for both brothers.

"The underlying question of these assignments is, what are the essentials required by the law to constitute a valid gift of personal property inter vivos, in a case like the present? Undoubtedly, there must be shown an intention to give; that is, an expressed purpose to divest the donor of title in and ownership of the thing given, carried into effect and evidenced by a delivery of possession to the donee, and acceptance by him. It, of course, inheres in the conception of the possession essential to a completed gift, that the donee should have such control, and such control only, of the subject matter of the gift, as is consistent with the ownership purported to be transferred to him. What shall constitute the essential delivery, possession or control, must depend always on the circumstances of each case and the environment of the parties. Where delivery of the property has once been made and possession transferred, the gift is irrevocable, and is not affected by the fact that the donor immediately thereafter comes into the physical possession and control of the property, without any retransfer of the ownership by the donee. Corle v. Monkhouse, 50 N.J.Eq. 537, 546, 25 A. 157; Matthews v. Hoagland, 48 N.J. Eq. 455, 485, 21 A. 1054. This being so, we see no reason why a gift should not be affected by a condition requiring temporary or partial control of the thing given by the donor, where the intention to transfer the ownership is made clear, and a possession commensurate with that ownership conferred upon the donee."

The opinion cites Industrial Trust Co. v. Scanlon, 26 R.I. 228, 58 A. 786, 3 Ann. Cas. 863. The court said: " 'The argument against the vesting of a joint title in a donee is that, because the donor can defeat the gift by drawing the deposit, control of the deposit is thereby retained, and so the gift is not absolute and complete. To this, it may be replied that the donee has the same power, if he has possession of the book. Both parties cannot hold the book at the same time, and the mere fact that one has possession of it, ought not to be conclusive against the rights of the other. * * * Some cases go so far as to hold that the entry on the book of joint title, is self-operative, and that delivery of the book is not necessary (McElroy v. National Sav. Bank, 8 App.Div. 192, 40 N.Y. S. 340), and that the retention of the right to draw the money deposited, does not affect the validity of the gift. (Dennin v. Hilton [N.J.Ch.] 50 A. 600).' * * * 'There can be no doubt that the owner of personal property has the right to give it

away in whole or in part. Consequently, he can give a joint ownership to another.'"

The opinion cites other cases. On page 61 of 152 F., the court said: "It is sufficient for the facts of this case to say, if the donor, with the clearly expressed intention of making a gift, make an actual delivery into the hands of the donee, the fact that the donor has lawful access to the depository of the thing given, does not invalidate the gift, if the donee has also the same access to said depository; and has such control over the thing given, that he may remove it at any time he chooses to do so. The intention of the donor to give, and the once vesting physical control in the donee, are, we think, the crucial points in this case. So thinking, we must hold that the parts of the charge of the learned judge of the court below, covered by the 18th and 19th assignments, above quoted, were calculated to mislead the jury, as to the essential characteristics of a gift inter vivos, to the prejudice of the plaintiff in error."

In re Hynes v. White, 47 Cal.App. 549, at page 553, 190 P. 836, at page 838, the court said: "The cases are uniform regarding the three requisites of a valid gift: First. An intention on the part of the donor to make it. Knight v. Tripp, 121 Cal. 674, 54 P. 267; Panning v. Green, 156 Cal. 279, 104 P. 308; Beaumont v. Beaumont [3 Cir.], 152 F. 55, 81 C.C.A. 251; Ruiz.v. Dow, 113 Cal. 490, 45 P. 867; Stewart v. Whittemore, 3 Cal.App. 213, 84 P. 841. Second. A delivery to the donee of the thing given. Civ. Code, § 1147; Beaumont v. Beaumont, supra; Beebe v. Coffin, 153 Cal. 174, 94 P. 766; Knight v. Tripp, supra; Hart v. Ketchum, 121 Cal. 426, 53 P. 931; Beaver v. Beaver, 117 N.Y. 421, 22 N.E. 940, 6 L.R.A. 403, 15 Am.St.Rep. 531. Third. Acceptance by the donee of the thing given. Beaumont v. Beaumont, supra; Holmes v. McDonald, 119 Mich. 563, 78 N.W. 647, 75 Am.St.Rep. 430; Beaver v. Beaver, supra; Frazier v. Perkins, 62 N.H. 69. The declarations of the donor both before and after the gift tended to show an intention on his part to make an absolute and unconditional gift. Estate of Hall, 154 Cal. 527, 98 P. 269; Ruiz v. Dow, supra; Stewart v. Whittemore, supra; Thornton on Gifts and Advancements, § 222 et seq.; Garrison v. Union Trust Co., 164 Mich. 345, 129 N.W. 691, 32 L.R.A.(N.S.) 219; Waite v. Grubbe, 43 Or. 406, 73 P. 206, 99 Am.St. Rep. 764; Reese v. Philadelphia Trust, etc., Co., 218 Pa. 150, 67 A. 124, 120 Am.St. Rep. 880. Where delivery of the property has once been made and possession transferred, the gift is irrevocable, and is not affected by the fact that the donor immediately thereafter comes in physical possession and control of the property without any retransfer of the ownership by the donee."

In Glenn's "Fraudulent Conveyances and Preferences", 1940, § 319, The Debtor's Act Must Bear Relation to the Subsequent Debt, it is stated:

"The essence of the fraudulent conveyance, as we have seen, is the diminution of the debtor's estate to the detriment of the creditor's right of realization. But there can be nothing wrong about a gift if a man has no creditors; and so if he later gets into debt, it cannot be said, as matter of law, that the gift which was lawful when made, should now be treated as fraudulent. The gift is merely an accident of the debtor's history; but wrongdoing, statutory or otherwise, is in the present tense, so to speak. As a general proposition * * * a man gets credit on the basis of his present condition; people 'give credit to their debtor as he is, for what he has, not for what he once had.'

"Hence the court has a duty, in the case of a subsequent creditor, that is quite different from the task which arises when the complaining creditor holds a claim which preceded the conveyance. The court must now find some connection between the act of the debtor and the liability which subsequently accrued, something to justify the statement that the debtor's conveyance was intended to injure the subsequent creditor. This justifying circumstance should lead to an inference of fact, and the question basically is one of fact.

"The last statement, however, must not be taken too literally. There are rules of law which attach to the process of getting at the debtor's intention to defraud his subsequent creditor,—and naturally enough, when one considers the long experience which our courts have had in this field." (page 557)

In re Schreyer v. Platt (Schreyer v. Scott), 134 U.S. 405, at page 409, 10 S.Ct. 579, at page 580, 33 L.Ed. 955, the court said:

"The conveyances were made and recorded more than three years prior to

the building contract out of which Vanderbilt's claim arose; and, while the mortgages to Mrs. Schreyer were executed and recorded during the same year with the building contract, yet the obligation assumed by Schreyer was a voluntary one, without consideration, and after a contract expressly providing for payment in another way, was conditional, and only became a fixed indebtedness two years thereafter, when by the foreclosure proceedings the worthlessness of the guarantied bond and mortgage was developed. Obviously, very clear and direct testimony is essential to support an adjudication that these various transfers were fraudulent and void as against this subsequent creditor. In determining the rules applicable to such transactions, reference should be had, not only to the decisions of this court, but also to those of the courts of New York, where the parties lived, and the transactions took place. Allen v. Massey, 17 Wall. 351 [21 L.Ed. 542]; Graham v. Railroad Company, 102 U.S. 148 [26 L.Ed. 106]; Wallace v. Penfield, 106 U.S. 260, 263, 264, 1 S.Ct. 216 [27 L.Ed. 147].

"In a recent case in the Court of Appeals of New York, Todd v. Nelson, 109 N.Y. 316, 327, 16 N.E. 360, that court thus stated the law: 'The theory upon which deeds conveying the property of an individual to some third party have been set aside as fraudulent in regard to subsequent creditors of the grantor has been that he has made a secret conveyance of his property while remaining in the possession and seeming ownership thereof, and has obtained credit thereby, while embarking in some hazardous business requiring such credit, or the debts which he has incurred were incurred soon after the conveyance, thus making the fraudulent intent a natural and almost a necessary inference, and in this way he has been enabled to obtain the property of others, who were relying upon an appearance which was wholly delusive. Such are the cases cited by the learned counsel for the appellants.' See, also, Phillips v. Wooster, 36 N.Y. 412; Curtis v. Fox, 47 N.Y. 299; Dunlap v. Hawkins, 59 N.Y. 342; Carr v. Breese, 81 N.Y. 584; and [Phoenix] Bank v. Stafford, 89 N.Y. 405. * * *

"It was said in Smith v. Vodges, 92 U. S. 183 [23 L.Ed. 481]: 'The law of this case is too well settled to admit of doubt. In order to defeat a settlement made by a husband upon his wife, it must be intended to defraud existing creditors, or creditors whose rights are expected shortly to supervene, or creditors whose rights may and do so supervene; the settler purposing to throw the hazards of business in which he is about to engage upon others, instead of honestly holding his means subject to the chance of those adverse results to which all business enterprises are liable. Sexton v. Wheaton, 8 Wheat. 229 [5 L.Ed. 603]; Mullen v. Wilson, 44 Pa. 413 [84 Am.Dec. 461]; Stileman v. Ashdown, 2 Atk. [478] 481.'

"In Graham v. Railroad Company, 102 U.S. 148, 154 [26 L.Ed. 106], it was said: 'It seems clear that subsequent creditors have no better right than subsequent purchasers to question a previous transaction in which the debtor's property was obtained from him by fraud, which he has acquiesced in, and which he has manifested no desire to disturb. Yet, in such a case, subsequent purchasers have no such right.' In Wallace v. Penfield, 106 U.S. 260, 262, 1 S.Ct. 216 [27 L.Ed. 147], in which it appeared that the husband transferring property to his wife was indebted at the time of the transfer, though not to the party complaining of the transaction, the court observed: 'His indebtedness existing at the time of the settlement upon the wife, as well as that which arose during the period of the improvements, was subsequently, and without unreasonable delay, fully discharged by him. The improvements were commenced in 1868, and were all, with trifling exceptions, completed and paid for before the close of the summer of 1869. So far as the record discloses, no creditor, who was such when the settlement was made, or while the improvements were going on, was hindered by the withdrawal by Williams, from his means or business, of the sums necessary to pay for the land and the improvements. Those who seek, in this suit, to impeach the original settlement, or to reach the means invested by the husband in improving the wife's land, became creditors of the former some time after the improvements (with slight exceptions not worth mentioning) had been made and paid for. If they trusted the husband in the belief that he owned the land, it was negligent in them so to do; for the conveyance of February 11, 1868, duly acknowledged, was filed for record within a few days after its execu-

tion.' And in Horbach v. Hill, 112 U.S. 144, 149, 5 S.Ct. 81 [28 L.Ed. 670], this language was used: 'The complainant not showing that he was at the time a creditor, cannot complain. Even a voluntary conveyance is good as against subsequent creditors, unless executed as a cover for future schemes of fraud.'"

While there have been many amendments to the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. the court is not advised of any changes which would modify its views as stated in this opinion. See, also, Sexton v. Wheaton and Wife, 8 Wheat. 229, 21 U.S. 229, 5 L.Ed. 603; and sections 3441 and 3442, Civil Code of California; Tainter v. Broderick Land & Investment Co., 177 Cal. 664, 171 P. 679.

In the absence of existing creditors at the time a gift is made, there is no presumption that the donor intended to defraud subsequent creditors. There must be evidence or circumstances which would convince the court that such was the intention of the donor. Here there is none. Several of the creditors could have protected themselves by filing liens upon the real estate—they did not take advantage of the statutes. Other creditors relied upon Horkheimer and there is no evidence that any representation was made to any of these creditors that Horkheimer owned or claimed any interest in the real or personal property described in the complaint at any time. It would be a dangerous doctrine which would permit a trustee in bankruptcy to go back over the years and set aside gifts made by the bankrupt at a time when he was perfectly solvent and had no creditors, in order to impress a trust upon property conveyed under such circumstances. Few individuals can anticipate the future.

It is the finding of this court that the five-acre piece of real property and its improvements described in paragraph four of the complaint, and the personal property described in the complaint are owned by the defendant, Dorothea Louise LaFonte, and that Herbert M. Horkheimer has no interest therein and therefore the plaintiff, E. A. Lynch as trustee in bankruptcy of the estate of Herbert M. Horkheimer, a bankrupt, has no interest in the real and personal property described in the complaint.

Judgment for the defendant, Dorothea Louise LaFonte, for her costs.